**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

Nos. 92-3941 c/w 92-3942

---

IN THE MATTER OF:    T-H NEW ORLEANS LIMITED
                        PARTNERSHIP,

                                        Debtor.


                    T-H NEW ORLEANS LIMITED
                        PARTNERSHIP,

                                        Appellee,


                        VERSUS


            FINANCIAL SECURITY ASSURANCE, INC.,

                                        Appellant.

---

Nos. 92-3959 c/w 92-3983

---

IN THE MATTER OF:    T-H NEW ORLEANS LIMITED
                        PARTNERSHIP,

                                        Debtor.


                    T-H NEW ORLEANS LIMITED
                        PARTNERSHIP,

                                        Appellant,


                        VERSUS


            FINANCIAL SECURITY ASSURANCE, INC.,

                                        Appellee.

Appeals from the United States District Court
for the Eastern District of Louisiana

(December 17, 1993)

Before EMILIO M. GARZA, and DeMOSS, Circuit Judges, and ZAGEL,[1] District Judge.

DeMOSS, Circuit Judge:

On its on motion, the Court withdraws the opinion issued in this case dated October 7, 1993, and substitutes the following:

## I. FACTS AND PROCEDURAL HISTORY

In 1988, TH-New Orleans Limited Partnership (TH-NOLP), a hotel partnership, acquired its major asset, the Days Inn Hotel on Canal Street in New Orleans, Louisiana (the Hotel). In 1989, TH-NOLP sought to restructure the underlying mortgage debt on the Hotel through a mortgage bond financing transaction. To achieve that end, TH-NOLP and six other hotel partnerships, all controlled by Monty Hundley and Stanley Tollman, obtained separate but cross-collateralized and cross-guaranteed first mortgage loans, which were secured by the Hotel and other hotels, in the amount of $87,000,000 from a newly created business trust (the issuer). With the execution of the Mortgage Note and Loan Agreement, TH-NOLP executed a Collateral Mortgage Note, a Collateral Real and Collateral Chattel Mortgage and Assignment of Leases and Rents, a Pledge of Collateral Mortgage Note (the Pledge), and a General Assignment of Accounts Receivable. TH-NOLP also executed a

_____

[1]District Judge of the Northern District of Illinois, sitting by designation.

2

Nonrecourse Guarantee, which guaranteed the payment of the six other borrowers under the loan transaction. TH-NOLP's maximum liability under the Guarantee is limited to the greater of TH-NOLP's net worth on the date of execution of the Guarantee, which was stipulated to be $18,425,000, or the net worth of TH-NOLP when the Guarantee is enforced.

To raise the necessary money to make the mortgage loans to TH-NOLP, the issuer issued $87,000,000 in bonds, the payment of which was guaranteed by a surety bond issued by Financial Security Assurance Incorporated (FSA). In return, the issuer of the bonds assigned to FSA all its rights and interest in the security agreements, and authorized FSA to be the "controlling party" and their attorney-in-fact to take whatever actions FSA deemed necessary to exercise its rights under the mortgage loans and related collateral.

By 1990, TH-NOLP and the six other partnerships were in default on the loans. After the parties were unable to reach a settlement, FSA accelerated the Mortgage Note and demanded payment of all amounts due under the Loan Agreement and Guarantee.[2] TH-NOLP filed for bankruptcy soon thereafter.

In the bankruptcy court, FSA filed a motion for relief from the automatic stay under 11 U.S.C. § 362(d)(1) and (2); and a motion for adequate protection or that the Hotel revenues be

---

[2] Similar notices of default and acceleration were sent to the six other hotel partnerships. Five of the six partnerships filed for bankruptcy and foreclosure has been completed in those cases. The other hotel partnership is currently in foreclosure proceedings in Florida state court.

3

segregated.  On March 19, 1992, the bankruptcy court granted FSA's relief from the stay on the grounds that FSA had shown that the secured property was not necessary to a successful reorganization. That ruling was based on the bankruptcy court's decision that TH-NOLP's plan of reorganization was unconfirmable, which was based on the findings that (1) the plan did not permit FSA to bid the full amount of its debt on the proposed sale of the Hotel, (2) the plan made no provision for FSA's unsecured debt, and (3) TH-NOLP had improperly classified creditors in its plan.  The bankruptcy court also granted FSA's motion for adequate protection or segregation of Hotel revenues.  TH-NOLP appealed to the district court, which affirmed the bankruptcy court's order granting FSA relief from the stay, but reversed the bankruptcy court's order granting FSA's motion for adequate protection or segregation of Hotel revenues because it held that FSA did not have a security interest in such revenues.  TH-NOLP and FSA now appeal to this court.[3]

## II.  DISCUSSION

The bankruptcy court's findings of fact are reviewed under a clearly erroneous standard.  In re Missionary Baptist Foundation of America, 818 F.2d 1135, 1142 (5th Cir. 1987).  The bankruptcy court's conclusions of law are "freely reviewable on appeal."  Id.

## 1.  Relief from Stay

---

[3]  FSA's appeals are in case numbers 92-3941 c/w 92-3942, which has been further consolidated with TH-NOLP's appeals in case numbers 92-3259 and 92-3983. All of the issues are intertwined. Case numbers 92-3941 c/w 92-3942 concern the motion for segregation of hotel revenues or adequate protection.  Case number 92-3259 concerns the confirmability of the plan, and case number 92-3983 concerns FSA's motion for relief from stay.

4

TH-NOLP contends that the bankruptcy court misinterpreted its plan of reorganization and its disclosure statement, which led the court to erroneously conclude that TH-NOLP did not have a reasonable probability of a successful reorganization within a reasonable period of time. Specifically, TH-NOLP contends that the bankruptcy court erred when it interpreted the plan to provide that FSA would be limited to bidding in the secured amount of its claim, as opposed to the full amount of its claim, when the Hotel was sold. Because of that alleged erroneous conclusion, TH-NOLP contends the bankruptcy court improperly determined that FSA was entitled to relief from the automatic stay to commence foreclosure proceedings against the Hotel.

The provisions of 11 U.S.C. § 362(a) provide an automatic stay against foreclosure proceedings when a debtor files a bankruptcy petition. Relief from the stay is warranted under 11 U.S.C. § 362(d)(2) if:

> (A) the debtor does not have an equity in such property; and
> (B) such property is not necessary to an effective reorganization.

TH-NOLP concedes that it has no equity in the Hotel. The only disputed issue is whether the Hotel is necessary to an effective reorganization. The term "necessary to an effective reorganization" has been interpreted to mean that the debtor has a reasonable probability of a successful reorganization within a reasonable period of time. United Savings Association of Texas v. Timbers of Inwood Forest Associates., Ltd., 484 U.S. 365, 375 (1988).

In its memorandum opinion, the bankruptcy court found that TH-NOLP owed $16,954,983 to FSA, and that the appraised value of the

5

Hotel was $12,200,000, leaving FSA with a under-secured nonrecourse deficiency claim for approximately $4,754,983.

TH-NOLP's plan proposed to deal with FSA's claim under 11 U.S.C. § 1111(b)(1)(A)(ii), which provides in pertinent part:

> (A) A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless--
>
> ...(ii) such holder does not have such recourse and such property is sold under section 363 of this title or is to be sold under the plan.

Section 1111(b)(1)(A) effectively provides under-secured nonrecourse creditors, such as FSA, an opportunity to elect to have their claims treated as recourse claims if their debtors retain the secured property. In re Tampa Bay Associates, Ltd., 864 F.2d 47, 50 (5th Cir. 1989). Under subsection (ii), however, a nonrecourse deficiency claim is not treated as a recourse obligation when there is a sale of the collateral at which a creditor may credit bid up to the full amount of its claim. Id. However, subsection (ii) may only be utilized when a creditor is entitled to credit bid up to the full amount of its claim, not just the amount of its secured claim. Id. In re National Real Estate Ltd. Partnership II, 104 B.R. 968, 974 (Bankr. E.D. Wis. 1989).

FSA's claim against TH-NOLP is a nonrecourse claim; FSA's recourse on its claim is limited solely to the collateral for the debt--the Hotel. The bankruptcy court decided that TH-NOLP's plan

6

did not provide for the treatment of FSA's entire debt because it did not address FSA's nonrecourse deficiency claim of $4,754,983; therefore it held that application of subsection (ii) was improper. Accordingly, the bankruptcy court held that the plan was unconfirmable, in that no reasonable prospect for a successful reorganization existed within a reasonable time, and lifted the automatic stay.

We disagree with the bankruptcy court's reading of the plan. Under the plan, TH-NOLP was to retain the Hotel for up to two years, during which time it would "actively market the Hotel and ... use its best efforts to procure a purchaser ... for the highest possible purchase price," and if it could not do so it would deed the Hotel to FSA. If a purchaser was found, the plan provided that FSA would be entitled to "credit bid the full allowed amount of its finally allowed claim." Additionally, TH-NOLP's disclosure statement provided:

> [s]ince the Trustee [FSA] is an under-secured, nonrecourse creditor and since the Plan provides for, the abandonment and/or sale of the Trustee's collateral security, with the Trustee being permitted to credit bid its **entire** nonrecourse claim prior to any sale, the Trustee will not be permitted to make any election under § 1111(b) of the Code.

Disclosure Statement at 13.

Based on the plain language of the plan and the disclosure statement, we hold that the bankruptcy court erred in holding that the plan was unconfirmable because it did not permit FSA to bid the

7

full amount of its claim, and consequently did not provide for FSA's nonrecourse deficiency claim.

As an additional ground for its ruling, the bankruptcy court held that the plan improperly gerrymandered classes of creditor's claims so as to manipulate the voting process for the purpose of facilitating a cramdown under 11 U.S.C § 1129 in violation of this court's opinion in In re Greystone III Joint Venture, 995 F.2d 1274 (5th Cir. 1991), cert. denied, 113 S. Ct. 72 (1992).[4] We address briefly one aspect of the bankruptcy court's decision.

In Greystone, debtor Greystone, whose only asset was an office building, filed for bankruptcy after its creditor, Phoenix Mutual, who had an $8.8 million nonrecourse promissory note, posted the property for foreclosure. When Greystone filed for bankruptcy, it owed Phoenix Mutual $9,325,000, its trade creditors $10,000, and the taxing authorities $145,000. The bankruptcy court valued Phoenix Mutual's secured claim at $5,825,000, which was the estimated value of the office building. Phoenix was left with an unsecured deficiency of $3,500,000, which was the difference between what the debtor owed Phoenix and its secured claim. The debtor's proposed plan separately classified the nonrecourse unsecured claim of Phoenix and the unsecured claim of the trade creditors. The trade creditors voted to accept the plan, and the

---

[4] The plan cannot be confirmed unless it is approved by two-thirds in amount and more than one-half in number of each impaired class, or at least one impaired class approves the plan and the debtor meets the cramdown requirements of § 1129(b). *See* Greystone, at 1277; 11 U.S.C §§ 1126(c), 1129(a)(8), and 1129(a)(10).

8

bankruptcy court confirmed it, in spite of Phoenix's objections, under the cramdown provision of 11 U.S.C. § 1129.

On appeal, this court held the plan was non-confirmable because it improperly gerrymandered the similar claims of Phoenix and the trade creditors. In reaching this result, the court announced in no uncertain terms the one commandment regarding creditor claim classification:

> ....**thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan.**

995 F.2d at 1279 (emphasis added).

In the present case, the bankruptcy court's opinion indicates that The Tollman-Hundley Management Group is an affiliate of the TH-NOLP; and it had a general unsecured claim for approximately $356,000, which was classified separate and apart from other general trade creditors. The bankruptcy court inferred that TH-NOLP segregated the Tollman-Hundley Management Group's unsecured claim so that the Tollman-Hundley Group would be able to cast a necessary vote to implement cramdown of the plan over FSA's objections. The bankruptcy court found that TH-NOLP gave no justification for the separate classification of its affiliate's claim, even though it was "substantially similar" to the claims of other general unsecured creditors; therefore it held the plan to be "unfairly discriminatory and inequitable" and "unconfirmable" as presented. But 11 U.S.C. § 1129(a)(10) expressly provides that if a class of claims is impaired under the plan, the plan may be confirmed only if at least one impaired class has accepted the

9

plan, "determined without including any acceptance of the plan by any <u>insider</u>." (emphasis added). None of the parties on appeal addressed the question of whether Tollman-Hundley Management Group was truly an "affiliate" of TH-NOLP and therefore, by definition, an "insider" for purposes of § 1129(a)(10).

Any finding by the bankruptcy court regarding improper classification could have been cured by amendment; but the bankruptcy court denied the request of TH-NOLP to file an amended plan. Consequently, without ruling on the propriety or not of the rulings on improper classification, we think justice will be better served by remanding the issues of confirmability of the plan and relief from the stay to the district court with instructions to remand these issues to the bankruptcy court so that (1) the bankruptcy court can make an express finding as to whether Tollman-Hundley Management Group is an "affiliate" of TH-NOLP; (2) the bankruptcy court can afford TH-NOLP an opportunity to amend the plan if it so desires; and (3) the bankruptcy court can conduct such further hearings as may be necessary to redetermine whether the amended plan shows "a reasonable prospect for a successful reorganization within a reasonable time." <u>See</u> <u>Timbers of Inwood Forest Associates Ltd.</u>, <u>supra.</u>


## 2. <u>Section 552(b)</u>

FSA contends (and the bankruptcy court held) that the post-petition hotel revenues are its cash collateral and it has a right for such revenues to be segregated for its benefit pursuant to the

10

terms of the Collateral Real and Collateral Chattel Mortgage and Collateral Assignment of Leases and Rents and 11 U.S.C. § 552(b).

Section 552(a) provides the general rule that property acquired by the debtor post-bankruptcy is not subject to a lien created by a security agreement before bankruptcy. Section 552(b), however, provides a significant exception:

> if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable non-bankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

11 U.S.C. § 552(b).

A creditor must meet two requirements under § 552(b) for a security agreement to survive post-bankruptcy:

1. The security agreement must extend to after-acquired property of the designated categories; and

2. the after-acquired property must fit within the five enumerated categories of § 552(b).

FSA's security agreements satisfy the first requirement. Under the terms of the Collateral Assignment of Leases and Rents, the debtor agreed to:

> ...transfer, pledge, collaterally assign and deliver unto Mortgagee as security for the payment and performance of the Obligations, and grant a security interest in, all of the right, title, and interest of the Mortgagor in and to all of the following:
>
> (a) The Leases;
> (b) The Rents;
> (c) The Fixtures; and
> (d) The Personality.

12

The document defined Rents as:

> [a]ll of the rents, revenues, income, proceeds, profits, security and other types of deposits, and other benefits paid or payable and to become due or payable to Mortgagor by parties to any Leases for using, leasing, licensing, possessing operating from, residing in, selling or otherwise enjoying any portion or portions of the Mortgaged Property, together with all cash and noncash proceeds of any or all thereof.

It defined Leases as follows:

> [a]ny and all leases, subleases, licenses, concessions or other agreements written or verbal, now or hereafter in effect, including any FF&E Lease(s), Space Leases (as defined below), Franchise Agreement(s) and license agreement(s) which grant a possessory interest in and to, or the right, license or concession to use, all or any portion of the Mortgaged Property, and all other agreements, such as utility contracts, maintenance agreements, Management Agreement (as defined below) and Service Agreement(s) (as defined below) which in any way relate to the use, occupancy, operation, maintenance, enjoyment, or ownership of all or any portion of such Mortgaged Property, together with any renewal or extension thereof and all leases, subleases, licenses, concessions or other agreements in substitution thereof, together with all cash or noncash proceeds of all or any thereof.

From the above language, it is apparent that FSA 's security interest extends to the revenues of the Hotel; and, therefore, satisfies the first requirement of § 552(b).

The crux of the dispute between the parties is whether the revenues fall within the classification of "proceeds, products, offspring, rents, or profits" in § 552(b). More specifically, the issue is whether the Hotel revenues are "rent."

13

State law defines "rent" for purposes of § 552(b).  *See* <u>Butner v. United States</u>, 440 U.S. 48 (1979).  Both parties agree that in the present case Louisiana law controls the issue of whether hotel revenues fit within the classification of rent.  Both parties also agree that <u>Pioneer Bank and Trust Co. v. Oeschner</u>, 468 So. 2d 1164, 1168 (La. 1985), is the dispositive Louisiana case on this issue; however, they interpret it differently.

In <u>Pioneer Bank</u>, Oeschner executed a promissory note and collateral mortgage to Pioneer Bank in connection with his purchase of the Superdome Motor Inn.  After Oeschner defaulted on the loan, Pioneer Bank sued him to enforce the collateral mortgage and for a writ of sequestration.  Oschner argued that Pioneer Bank did not have a right to sequester the Hotel revenues because it had a lien only on the Hotel property, not the revenue.

The applicable Louisiana Sequestration statute, La. Code Civ. Proc. art. 327, provided:

> [t]he seizure of the property by the sheriff effects the seizure of the fruits and issues which it produces while under seizure.  The sheriff shall collect all rents and revenue produced by property under seizure.

Therefore, the decisive question was whether the Hotel revenues, which Pioneer was attempting to seize, were "rents or revenues" within the meaning of the Louisiana sequestration statute.  <u>Pioneer Bank</u>, 468 So. 2d at 1168.  The Louisiana Supreme Court concluded that the statute allowed Pioneer Bank to have the property seized under a writ of sequestration and to collect the revenues produced by the Hotel.  In reaching its result, the court reasoned:

14

> ....the revenues paid into Superdome Motor Inn by its guests are, **like rent,** paid for the use of the property. In that sense, they, **like rent,** are produced by the property. Second, the mortgage expressly covers all property, movable and immovable, "used in connection with the operation of the .... property." This combination of facts, i.e., the nature of the revenues and that the mortgage covers all property used in the operation of the property, leads us to conclude that the revenues at issue are "produced by the property."

Pioneer Bank, at 1168 (emphasis added).

In our view, Pioneer Bank supports our conclusion here that hotel revenues are sufficiently "like rent" under Louisiana law to be included within the term "rents" in § 552(b).  Therefore, we hold that FSA is entitled to have the Hotel revenues segregated for its benefit.

We have carefully and exhaustively searched the legislative history of § 552(b) for any indication that in using the term "rents" Congress intended to exclude revenues generated by hotels and motels for the use of their lodging rooms by third parties; but we have been unable to locate even a scintilla of such intent. Clearly, in our view, the term "rents" would include revenues generated by apartments, office buildings, shopping centers, and warehouses for the use and occupancy of space within such facilities, and, absent some clear and express indication by the Congress that the word "rents" was not to include revenues from hotels and motels, we see no reason to provide such exclusion by judicial interpretation.  To the contrary, given the other broad, generic terms utilized by Congress in § 552(b), we believe a

15

generic interpretation of "rents" as "payments made for the use of property" is most consistent with congressional intent.

TH-NOLP contends that hotel revenues are "accounts receivable" under the Louisiana Accounts Receivable Act. *See e.g.,* In re Texas Tri-Collar, Inc., 29 B.R. 724 (Bankr. W.D. La. 1983). In that statute, "accounts receivable" are defined as follows:

> "[a]ccounts receivable" or "account" means and includes all or any part of any indebtedness owing to the assignor in connection with all or any part of the assignor's business, profession, occupation or undertaking, including but not limited to the sale of goods or the performance of services or the leasing of a movable property subject to the Louisiana Lease of Movables Act. "Accounts receivable" or "account" shall not mean or include:
>
> (a)  Indebtedness due to or arising out of claims in tort;
>
> (b)  Indebtedness evidenced by a promissory note, other than a lease note, or negotiable instrument; or
>
> (c)  Indebtedness due to or arising out of the leasing of immovable property.

La. R.S. § 9.3101(1).

According to TH-NOLP, the revenue received by a hotel operator represents the payment by hotel guests on indebtedness owing to the hotel operator in connection with hotel business, not "rent" of the hotel property. TH-NOLP contends that it takes the combined efforts of its numerous skilled and dedicated employees to generate revenues from the Hotel, and without the combined efforts of these individuals the "Hotel could not generate a dime of revenue." Ultimately, TH-NOLP's premise is that hotel revenues are dependent upon and generated from the service aspect of the hotel, and, as such are in the nature of accounts receivable.

16

We disagree. First of all, sub-item (c) of the Louisiana statutory definition quoted above expressly eliminates "indebtedness due to or arising out of the leasing of immovable property"; and in our view, revenues received by hotel and motel operators for the use of their rooms fall squarely under this exclusion. Secondly, in our view, the physical condition of the Hotel and its location are more essential to the Hotel's ability to generate revenue than the services it provides. Take away the land and the bricks and mortar, and there is nothing upon which the collateral services of entertainment, food, recreational activities, laundry and cleaning could exist. The converse is not true, for many chains of motels have been successful in providing "simply a good night's rest at the most economical price." Therefore, we reject the notion that a hotel's revenues are so intertwined and dependent on the hotel's service that one cannot conclude the revenues are rent for purposes of § 552(b).

We recognize that several bankruptcy and district court decisions have reached a result contrary to that we reach here. *See e.g.*, In re Punta Gorda Associates, 137 B.R. 535 (Bankr. M.D. Fla. 1992); In re GGVXX, Ltd., 130 B.R. 322 (Bankr. D. Colo. 1991). However, those decisions involved the interpretation of other states' statutory provisions regarding classification of rent, and thus they are of little significance in the present case where we are applying Louisiana law. Moreover, we are persuaded by the clear language of the loan documents that the borrower intended, and the lender expected, that the Hotel revenues would stand as

security for the loan. The income flow generated by the Hotel revenues are an integral part of the value that the lender assigns to the collateralized property. If, as indicated by <u>Pioneer</u>, a lender may reach and control revenues from a hotel for purposes of Louisiana's _sequestration remedies, we can see no reason for depriving that same lender of the benefit of his expressly bargained-for-security when the question is application of § 552(b) in bankruptcy. To deprive the lender of what he bargained for at closing, especially when that expectation matches the intent of the borrower, is inequitable and ignores widely accepted lending practices of the business community.

### III.  CONCLUSION

We reverse the holding of the bankruptcy court that the plan was unconfirmable because it did not permit FSA to credit bid the full amount of its claim. We VACATE the holding and REMAND the issues of confirmability of the plan and relief from stay for redetermination by the bankruptcy court. We also hold that the district court erred in reversing the judgment of the bankruptcy court which allowed FSA to segregate the Hotel revenues for its benefit. Accordingly, we VACATE in part and REVERSE in part, and REMAND this case to the district court with instructions to REMAND to the bankruptcy court for further proceedings consistent herewith.