United States Court of Appeals,

Eleventh Circuit.

No. 94-8342.

FINANCIAL SECURITY ASSURANCE, INC., Plaintiff-Appellant,

v.

TOLLMAN-HUNDLEY DALTON, L.P., Defendant-Appellee.

Feb. 12, 1996.

Appeal from the United States District Court for the Northern District of Georgia. (No. 4:93-CV-356-HLM), Harold L. Murphy, District Judge.

Before COX, Circuit Judge, and CLARK and WOOD, Jr.[*], Senior Circuit Judges.

PER CURIAM:

This case involves a security agreement pursuant to which the debtor granted the creditor a security interest in the debtor's hotel and in all rents, issues and profits associated with its operation. After the debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code, the creditor relied upon its prepetition security interest to seek accounting of the postpetition hotel revenues. Applying § 552 of Title 11 of the Bankruptcy Code, the bankruptcy court concluded that the prepetition security interest did not extend to postpetition hotel revenues derived from rent; thus, the postpetition revenues were property of the debtor's estate. The district court affirmed. Having carefully studied § 552 and the applicable Supreme Court precedent, we conclude that the bankruptcy court and the district court improperly looked to state law to define the language of §

[*]Honorable Harlington Wood, Jr., Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

552 and, therefore, misconstrued this section.  We reverse.

## I. BACKGROUND

In February, 1989, Tollman-Hundley Dalton, L.P. ("THD"), which owned and operated a Holiday Inn in Dalton, Georgia, borrowed $10,151,088.00 to refinance an existing loan on the hotel. Financial Security Assurance, Inc. ("FSA") provided the financial accommodations and eventually succeeded to all rights of the original lender.  THD granted FSA a security interest in the hotel real property and improvements, related tangible and intangible personal property, and all rents, issues and profits associated with the hotel and its operation.  The parties have stipulated that the security agreement was intended to cover all hotel revenues. Thus, FSA held a first-priority, properly-perfected security interest in the hotel and the revenues generated therefrom.

In October 1990, THD defaulted on its monthly payment to FSA. On February 25, 1991, FSA accelerated the payments due under the security agreement, revoked THD's license to collect rents, and filed an action in the Superior Court of Whitfield County, Georgia, to obtain the appointment of a receiver to collect the hotel revenues.  On March 1, 1991, however, prior to the appointment of a receiver, THD filed a voluntary petition under Chapter 11 of the Bankruptcy Code, staying the action for appointment of a receiver.

THD operated the hotel as a debtor-in-possession from March 1, 1991, through April 7, 1992, when FSA obtained relief from the automatic stay and foreclosed its interest in the hotel.  FSA contends that, during this 13-month period, the hotel generated more than $4,000,000 in gross revenues.  All of the hotel's

postpetition operating expenses have been paid and approximately $400,000 of postpetition hotel revenues remains to be distributed. It is this $400,000 of revenues that is at issue in the appeal.

FSA filed a motion with the bankruptcy court for abandonment and accounting of the hotel revenues, and THD filed a motion seeking authorization to use the revenues for a plan of liquidation. FSA took the position that it was entitled to the hotel revenues under the terms of the prepetition security agreement; THD disagreed, arguing that the prepetition security interest did not extend to the postpetition revenues and, therefore, the revenues were property of the debtor estate.

To resolve the outstanding motions, the bankruptcy court looked to 11 U.S.C. § 552, which governs prepetition security interests in a debtor's postpetition revenues. Section 552(a) provides the general rule that postpetition property of the debtor or estate is not subject to any lien resulting from any prepetition security agreement; section 552(b) provides an exception for liens resulting from prepetition security agreements that cover "proceeds, product, offspring, rents, or profits." Relying on the Supreme Court's decision in *Butner v. United States,*[1] the bankruptcy court held that state law defines the terms "proceeds, product, offspring, rents or profits." The court then undertook a thorough review of Georgia law and concluded that, "under Georgia law hotel revenues are not properly characterized as rent."[2] The

---

[1] 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

[2] *In re Tollman-Hundley Dalton, L.P.,* 162 B.R. 26, 29 (Bankr.N.D.Ga.1993).

bankruptcy court further concluded that hotel revenues do not constitute "profits," noting that "FSA has been unable to cite any Georgia authority for the proposition that hotel revenues comprise profits."[3]  Thus, the bankruptcy court held:

> In sum, the court finds that under Georgia law hotel revenues do not constitute "rents" or "profits" for the purposes of section 552(b).  Therefore, under section 552(a) FSA does not have any interest in the postpetition revenues generated by the Hotel.[4]

FSA appealed, and the district court affirmed, following the reasoning of the bankruptcy court.  This appeal followed.

## II. DISCUSSION

The version of § 552 applicable to this appeal provides:

> (a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

> (b) Except as provided in sections 363, 506(c), 552, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.[5]

---

[3]*Id.* at 30.

[4]*Id.*

[5]11 U.S.C. § 552 (1988).  Congress amended § 552 with the Bankruptcy Reform Act of 1994, Pub.L. No. 103-394, 108 Stat. 4106 (codified as amended 11 U.S.C. § 552 (1994)).  The amendment is not applicable to cases, such as this one, commenced prior to October 22, 1994.  Pub.L. 103-394 § 702, 108 Stat. 4150.  As is discussed later in this opinion, the amendment, while inapplicable to this case, aids our construction of the version

THD does not dispute that FSA's prepetition security interest covered hotel revenues. THD argues that this security interest nevertheless does not reach postpetition revenues generated by the hotel due to the application of § 552(a). In response, FSA argues that its security interest falls within the exception to § 552(a) set out in § 552(b); specifically, FSA contends that the postpetition hotel revenues constitute "rents" within the meaning of § 552(b) and, therefore, its security interest extends to these revenues.[6]

The district court, following the reasoning of the bankruptcy court, held "that *Butner* requires that state law define the terms "proceeds, product, offspring, rents, or profits' in section 552(b)."[7] We disagree.

*Butner,* like this case, was a Chapter 11 bankruptcy proceeding in which a dispute arose between the bankruptcy trustee and a mortgagee over the right to the rents collected during the period between the filing of the mortgagor's bankruptcy petition and the foreclosure sale of the mortgaged property. Unlike this case, however, the security agreement in *Butner* did *not* specifically cover rents; rather, the mortgagee relied upon North Carolina law, which gave a mortgagee a security interest in rents collected on the mortgaged property if certain conditions were met. And, unlike

of § 552 that is applicable.

[6]FSA also contends that the hotel revenues constitute "profits" within the meaning of § 552(b). Because we conclude that the revenues fall within the definition of "rents," we need not decide whether they also constitute "profits."

[7]*Financial Security Assurance, Inc. v. Tollman-Hundley Dalton, L.P.,* 165 B.R. 698, 702 (N.D.Ga.1994).

this case, *Butner* did *not* involve § 552.  The issue litigated before the bankruptcy court, the district court, and the court of appeals in *Butner* was whether, notwithstanding that the security agreement did not specifically cover rents, the mortgagee nevertheless had a security interest in rents under North Carolina law.

The Supreme Court granted certiorari in *Butner not* to decide the state law question, but to resolve a conflict among the circuits as to whether state law or a federal rule of equity determined a mortgagee's security interest in property following the filing of a bankruptcy petition.  In holding that state law determined this interest, the Supreme Court said:

> Property interests are created or defined by state law....  The [federal rule of equity], at least in some circumstances, affords the mortgagee rights that are not his as a matter of state law.  The rule we adopt avoids this inequity because it looks to state law to define the security interest of the mortgagee.[8]

Thus, the Supreme Court held that North Carolina law determined whether the mortgagee's security interest covered rents from the mortgaged property.

The questions litigated in *Butner* are not at issue in this case.  From *Butner* we learn that we must apply Georgia law to determine whether FSA's security interest extends to the hotel revenues.  Unlike the security agreement in *Butner,* the security agreement at issue here specifically covers rents, issues and profits of the mortgaged property.  THD does not dispute that, under Georgia law, such an agreement covers hotel revenues.  Thus,

---

[8]*Butner,* 440 U.S. at 55-56, 99 S.Ct. at 918-19.

while *Butner* is relevant to this case, it is applicable only to confirm what the parties do not dispute: absent § 552, FSA's security interest extends to the hotel revenues.

The crux of this case is whether § 552 operates to cut off FSA's right to postpetition hotel revenues. *Butner* is of no assistance in resolving this issue. Contrary to the district court's determination, nothing in *Butner* suggests that state defines the language of the federal Bankruptcy Code in general, or of § 552 in particular. Neither does § 552 dictate such a result. Section 552(b) provides that a prepetition security interest in derivative property may extend to postpetition derivative property "to the extent provided by [the] security agreement and by applicable nonbankruptcy law." This reference to "nonbankruptcy law," or state law, is consistent with *Butner:* it prevents a creditor from using a debtor's bankruptcy to acquire rights to which he would not otherwise be entitled under state law. The reference to "nonbankruptcy law" does *not* suggest that state law defines the language of § 552.

Thus, we hold that the district court erred in looking to Georgia law to define the language of § 552, specifically, to define the term "rents" as used in § 552(b).[9] To construe this

---

[9]Two circuit courts, like the district court in this case, have relied on *Butner* to justify looking to state law to define the term "rents" as used in § 552(b). *See Financial Security Assurance, Inc. v. Days California Riverside Limited Partnership,* 27 F.3d 374, 376 (9th Cir.1994); *T-H New Orleans Limited Partnership v. Financial Security Assurance, Inc.,* 10 F.3d 1099, 1104 (5th Cir.1993), *cert. denied,* --- U.S. ----, 114 S.Ct. 1833, 128 L.Ed.2d 461 (1994). For the reasons explained above, we decline to follow these two circuits.

term, we look to the plain meaning of the statute.[10]

In Black's Law Dictionary, the term "rent" is defined: "Consideration paid for use or occupation of property. In a broader sense, it is the compensation or fee paid, usually periodically, for the use of any rental property, land, buildings, equipment, etc."[11] Clearly, hotel revenues fall within the "broader sense" of this definition. A plain reading of § 552(b) indicates that Congress intended "rents" to be construed in this broader sense. The term "rents" in § 552(b) is encompassed within the phrase "proceeds, product, offspring, rents, or profits." With this phrase, Congress intended to cover a wide range of derivative property. It did not, therefore, intend that the term "rents," or any other term used in the phrase, be construed in a restrictive sense. Accordingly, we hold that the term "rents" as used in § 552(b) includes hotel revenues.

Our conclusion is supported by the Bankruptcy Reform Act of 1994, which amended § 552(b). The amendment is as follows:

> (a) POSTPETITION EFFECT OF SECURITY INTEREST.—Section 552(b) of title 11, United States Code, is amended—
>
> (1) by inserting "(1)" after "(b)".
>
> (2) by striking "rents," each place it appears, and
>
> (3) by adding at the end the following:
>
> "(2) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, and notwithstanding section 546(b) of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security

---

[10]*See United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241-42, 109 S.Ct. 1026, 1030-31, 103 L.Ed.2d 290 (1989).

[11]Black's Law Dictionary at 1297 (6th ed. 1990).

agreement extends to property of the debtor acquired before the commencement of the case and to amounts paid as rents of such property or the fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties, then such security interest extends to such rents and such fees, charges, accounts, or other payments acquired by the estate after the commencement of the case to the extent provided in such security agreement, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.".[12]

Thus, the current version of § 552(b) explicitly covers hotel revenues. This current version is applicable only to cases commenced after October 21, 1994;[13] accordingly, it is not applicable to this case. Nevertheless, the current version of § 552(b) aids our construction of the previous version applicable to this case.

The legislative history of the Bankruptcy Reform Act of 1994 indicates that Congress intended the amendment to § 552(b) to *clarify* the law, *not* to change the law. Specifically, the legislative history of the pertinent provision provides:

> Section 215 also *clarifies* the bankruptcy treatment of hotel revenues which have been used to secure loans to hotels and other lodging accommodations. These revenue streams, while critical to a hotel's continued operations, are also the most liquid and more valuable collateral the hotel can provide to its financiers. When the hotel experiences financial distress, the interests of the hotel operations, including employment for clerks, maids, and other workers can collide with the interests of persons to whom the revenues are pledged. Section 215 recognizes the importance of this revenue stream for the two competing interests and attempts to strike a fair balance between them.[14]

---

[12]Bankruptcy Reform Act of 1994, Pub.L. No. 103-394, 108 Stat. 4106, 4126 (codified as amended at 11 U.S.C. § 552(b) (1994)).

[13]Pub.L. 103-394 § 702, 108 Stat. 4106, 4150.

[14]H.R.Rep. No. 103-385, 103d Cong., 2nd Sess., *reprinted in* 1994 U.S.C.C.A.N. 3340, 3357 (emphasis added).

Thus, the 1994 amendment to § 552(b) was intended by Congress to *clarify* that this subsection covers hotel revenues. This is consistent with our holding that § 552(b) as in effect prior to the 1994 amendment encompasses hotel revenues.

**CONCLUSION**

For the reasons explained above, we hold that the term "rents" as used in the version of § 552(b) predating the 1994 amendment encompasses hotel revenues. Accordingly, the decision of the district court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

CLARK, Senior Circuit Judge, concurring in part and dissenting in part:

I agree philosophically with the majority's result in this case, but regrettably I read the statute differently. I agree that the current [1994] version of 11 U.S.C. § 552 would require the majority's result. This case is governed by the § 552 which was in effect prior to October 22, 1994, with which the majority agrees. The majority takes the change in the statute by the 1994 Act as bolstering its interpretation of the 1984 statute.

Section 552 has as its subject the "Postpetition effect of security interest." The 1984 statute, with which we are concerned, provided that a security interest conveyed in an agreement entered into between a creditor and a debtor prior to bankruptcy extended after commencement of a bankruptcy case to "proceeds ... rents, or profits" of the property "to the extent provided by such security agreement and by *applicable nonbankruptcy law*...." It is my view that the district court was correct in interpreting the phrase "non-bankruptcy" law to mean state law, in this case, Georgia law.

I agree with the courts in the Fifth and Ninth Circuits whose opinions are cited in Note 9 of the majority opinion for the proposition that state law defines the meaning of the word "rents" as used in § 552(b).

I am also persuaded by the changes made in the 1994 version of § 552(b) by Congress.  The new version of § 552(b) is quoted in the majority opinion on pages 9-10 and I shall not duplicate it here. The 1994 change reflects that Congress thought the phrase in the 1984 law "applicable non-bankruptcy law" referred to state laws. In House Report No. 103-385, 103rd Cong. 2nd Session, reprinted in 1994 U.S.C.C.A.N. 3340 at 3357, in explaining changes wrought by the Bankruptcy Reform Act under consideration, the report states:

> Under current section 552 of the Bankruptcy Code, real estate lenders are deemed to have a security interest in postpetition rents only to the extent their security interest has been "perfected" under applicable State law procedures.[16] Inclusion under section 552, in turn, allows such proceeds to be treated as "cash collateral" under section 363(a) of the Bankruptcy Code, which prohibits a trustee or debtor-in-possession from using such proceeds without the consent of the lender or authorization by the court.  In a number of States, however, it is not feasible for real estate lenders to perfect their security interest prior to a bankruptcy filing;  and, as a result, courts have denied lenders having interests in postpetition rents the protection offered under sections 552 and 363 of the Bankruptcy Code. [17] Section 214 provides that lenders may have valid security interests in postpetition rents for bankruptcy purposes notwithstanding their failure to have fully perfected their security interest under applicable State law.  This is accomplished by adding a new provision to section 552 of the Bankruptcy Code, applicable to lenders having a valid security interest which extends to the underlying property and the postpetition rents.

> [16] *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

> [17] *See, e.g., In re Multi-Group III Ltd. Partnership,* 99 B.R. 5 (Bankr.D.Ariz.1989);  *In re Association Center Ltd. Partnership,* 87 B.R. 142 (Bankr.W.D.Wash.1988);  *In re TM Carlton House Partners, Ltd.,* 91 B.R. 349 (Bankr.E.D.Pa.1988);

*In re Metro Square*, 93 B.R. 990 (Bankr.D.Minn.1988).

Each of the Bankruptcy Court decisions cited in Note 17 holds that State law governs and limits the meaning of the word "rents" as used in § 552(b). Those decisions, and law review articles which have criticized § 552(b) as it existed prior to this 1994 change, interpret the previously existing section as did the district court whose opinion we review here. I applaud the 1994 change. It belatedly brings the statute into line with the philosophy of the Uniform Commercial Code which had as its purpose making the laws of all states alike so that financial institutions across the country could lend across state lines with confidence.

I think the district and bankruptcy court judges correctly interpreted the statute and court decisions which bound them.