## In re CAFETERIA OPERATORS, L.P., et al., Debtors.

### No. 03–30179 HDH–11.

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

July 1, 2003.

---

1. *In re Barron,* 325 F.3d 690 (5th Cir.2003).

Samuel M. Stricklin, Bracewell and Patterson, Dallas, TX, for Debtor.

John E. Mitchell, Vinson & Elkins, Dallas, TX, for Fleet National Bank, Agent.

Holland N. O'Neil, Gardere, Wynne & Sewell, Dallas, TX, for Official Committee of Unsecured Creditors.

## MEMORANDUM OPINION ON DEBTORS' CASH COLLATERAL MOTION

HARLIN D. HALE, Bankruptcy Judge.

This Memorandum Opinion addresses the issue of whether a restaurant's post-petition income is cash collateral when the secured lender holds a pre-petition lien, *inter alia,* on debtor's inventory. The Court finds that because the use of food and beverage inventory representing the secured lender's pre-petition collateral undoubtedly makes up part of a debtor restaurant's post-petition income, such income is, in part, the secured lender's cash collateral. The use of such cash collateral is approved pursuant to 11 U.S.C. § 363(c)(2), upon entry of an order providing adequate protection to the secured lender.

### *Facts*

The Debtors operate family-style cafeteria restaurants in several states. The Debtors also own and operate a food preparation, processing and distribution center that processes and delivers various food items, both internally to the Debtors' restaurants and externally to third-party purchasers. On April 10, 2001, the Debtors entered into a $55,000,000 Revolving Credit and Term Loan Agreement ("Credit Agreement") with Fleet National Bank on behalf of itself and as agent for a group of secured lenders (collectively, the "Bank Group"). In connection with the Credit Agreement, Bank Group was granted a security interest in certain personal and real property, including, in relevant part

> [a]ll personal and fixture property of every kind and nature including without limitation all furniture, fixtures, equipment, raw materials, inventory, other goods, accounts, ... deposit accounts, rights to proceeds of letters of credit and all general intangibles.

On January 3, 2003 (the "Petition Date"), the Debtors commenced reorganization cases under Chapter 11 of the Bankruptcy Code. Immediately thereafter, the Debtors filed an Emergency Motion for Interim and Final Orders (I) Authorizing the Use of Cash Collateral Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b), and (II) Granting Adequate Protection to the Prepetition Secured Lender (the "Cash Collateral Motion").

Pursuant to the Credit Agreement and other related documents, the Bank Group alleges pre-petition claims in an aggregate amount of $43,400,000.00 plus contingent reimbursement obligations with respect to

$3,280,000.00 of outstanding letters of credit against the Debtors. Further, the Bank Group alleges that these claims are secured by security interests in substantially all of the personal property, including cash on hand, the Debtors' food and beverage inventory as of the Petition Date, and fixtures, and certain real property[1] of the Debtors at the time the petition was filed.

On January 7, 2003, the Debtors and Bank Group submitted an Interim Agreed Order Authorizing Limited Use of Cash Collateral and Granting Adequate Protection to Existing Lienholders to the Court (the "Interim Order"), which the Court entered. The Interim Order was extended by several stipulations. However, the parties eventually reached an impasse with respect to Debtors' use of the alleged cash collateral of the Bank Group.

This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 157 and 1334(b). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

### The Parties' Relative Positions

In the Cash Collateral Motion, Debtors concede that all cash, with one exception, held by the Debtors in its bank accounts on the Petition Date is the Bank Group's cash collateral by operation of a blocked account agreement between the parties. (Cash Collateral Mot. at ¶ 15.) The Debtors assert that all cash and cash equivalents generated *subsequent to the commencement of these proceedings* are for services, and are therefore not the proceeds, profits, product or offspring of any property secured by the Bank Group's lien. Therefore, the Debtors claim that the cash and cash equivalents generated post-petition are not subject to the pre-petition liens or security interests of any

lienholder pursuant to 11 U.S.C. § 552. The Official Committee of Unsecured Creditors supports Debtors' position.

The Bank Group asserts that, pursuant to § 363(a) of the Bankruptcy Code, it has a perfected security interest that continues in, and attaches to, all post-petition revenue generated by the Debtors' business operations because it has a lien "on everything." The Bank Group refused to consent further to the Debtors' use of any potential cash collateral or its proceeds once the Interim Order (as extended) expired.

This Court held an evidentiary hearing on the cash collateral motion and announced findings, conclusions, and a ruling on the record. This Memorandum Opinion supplements the oral ruling of the Court.

### Authorities

The starting point in any cash collateral analysis is the language of Bankruptcy Code § 363, which states, in relevant part, that a debtor-in-possession may not use, sell or lease cash collateral unless 1) each entity with an interest in the cash collateral consents to or 2) the court, after notice and hearing, authorizes the use of, cash collateral. 11 U.S.C. § 363(c)(2). Cash collateral is defined in the Bankruptcy Code as

> cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other that the estate have an interest and includes the *proceeds*, products, offspring, rents, or profits of property ... whether existing *before* or *after* the commencement of a case under this title.

11 U.S.C. § 363(a) (emphasis added).

Section 552 of the Bankruptcy Code limits a secured creditor's interest in post-

---

1. The parties acknowledge that Bank Group does not hold a valid pre-petition lien on certain real property located in Lubbock, Tex- as, generally described as 3001 50th Street, Lubbock, Texas.

petition property of the estate. Section 552 provides, in relevant part:

(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.
(b)(1) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, or profits of such property, then such security interest extends to such proceeds, product, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

11 U.S.C. § 522(a) and (b)(1).

Prior to the enactment of the Bankruptcy Code, no statutory authority defined the limits of a secured creditor's liens after a bankruptcy petition was filed. During the Great Depression, the Supreme Court filled this void in *Local Loan v. Hunt*, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934). In *Local Loan*, the Court held that pre-petition security interests could only attach to, and possibly continue on, property existing on the date of the petition. *Id.* at 242–43, 54 S.Ct. 695.

The Court went on to hold more specifically that pre-petition liens do not extend to post-petition property, *i.e.* wages, produced by the debtor's labor. *See id.* at 244–45, 54 S.Ct. 695. The Court reasoned that the fresh start policy dictates that the debtor be allowed to emerge from bankruptcy and "start afresh free from the obligations and responsibilities consequent upon business misfortunes." *Id.* at 245, 54 S.Ct. 695.

When a person assigns future wages, he, in effect, pledges his future earning power. The power of the individual to earn a living for himself and those dependent upon him is in the nature of a personal liberty quite as much if not more than it is a property right. To preserve its free exercise is of the utmost importance, not only because it is a fundamental private necessity, but because it is a matter of great public concern. From the viewpoint of the wage-earner there is little difference between not earning at all and earning wholly for a creditor. Pauperism may be the necessary result of either.... The new opportunity in life and the clear field for future effort, which it is the purpose of the Bankruptcy Act to afford the emancipated debtor, would be of little value to the wage-earner if he were obliged to face the necessity of devoting the whole or a considerable portion of his earnings for an indefinite time in the future to the payment of indebtedness incurred prior to his bankruptcy.

*Id.*

Thus, to allow a pre-petition lien on future wages generated post-petition would be tantamount to robbing the debtor who "surrenders for distribution the property which he owns at the time of bankruptcy, a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt." *Id.* at 244, 54 S.Ct. 695.

With the passage of the Bankruptcy Code, Congress enacted § 552 to limit legislatively the effect of pre-petition liens on

the debtor's post-petition property. As noted by one bankruptcy court, "[i]t is beyond question that in enacting § 552, Congress sought to preserve the 'fresh start' policy so eloquently stated by the Supreme Court in *Local Loan* by requiring that only security interests in after-acquired property 'arising from, or connected with, preexisting property' be preserved in bankruptcy." *Smoker v. Hill & Associates, Inc.,* 204 B.R. 966, 974 (N.D.Ind.1997) (citing *Local Loan,* 292 U.S. at 243, 54 S.Ct. 695). The passage of § 552 broadened the scope of the *Local Loan* holding to extinguish all liens on after-acquired property, subject to certain exceptions.

■■■ Under § 552 of the Bankruptcy Code, post-petition property acquired by the debtor's estate, such as revenues generated from operations, is not subject to any liens resulting from pre-petition security agreements unless the pre-petition security agreements create a security interest in pre-petition property and its proceeds, product, offspring, rents or profits and the post-petition property constitutes such proceeds, product, offspring, rents or profits. *See* 11 U.S.C. § 552 (2002); *T–H New Orleans Ltd. Pship v. Financial Security Assurance, Inc. (In re T–H New Orleans Ltd. Pship.),* 10 F.3d 1099, 1104 (5th Cir.1993), *cert. denied,* 511 U.S. 1083, 114 S.Ct. 1833, 128 L.Ed.2d 461 (1994). From a plain reading of § 552, revenues generated post-petition solely as a result of the debtor's labor are not subject to a pre-petition lender's security interest.

■■■ For a pre-petition security agreement to attach to after-acquired property, a creditor must show the following: 1) the security agreement extends to the after-acquired property upon which the creditor seeks the lien, and 2) the after-acquired property is proceeds, product, offspring, rents, or profits of pre-petition property subject to the lien. *Id.* The express terms of the security agreement generally govern the first prong, while state law generally governs the second prong.[2] *Id.; see also Unsecured Creditors*

---

2. In *T–H New Orleans Ltd. Pship v. Financial Security Assurance, Inc. (In re T–H New Orleans Ltd. Pship.),* 10 F.3d 1099, 1104 (5th Cir.1993), *cert. denied,* 511 U.S. 1083, 114 S.Ct. 1833, 128 L.Ed.2d 461 (1994), the Fifth Circuit stated that state law defined "rent" for purposes of § 552(b); however, the Court also looked to the legislative history of § 552 to determine if Congress intended to exclude hotel revenues from the definition of rents without discussion of why the legislative history would impact state law. Some courts have specifically rejected any analysis of § 552's legislative history. In particular, the Fourth Circuit stated

Section 552(b) fails to establish the parameters of "proceeds." Two interpretations are possible. One infers from the absence of a Code definition and from Section 552(b)'s language limiting any security interest "to the extent provided by … applicable non-bankruptcy law" that Congress intended to defer to state law, *i.e.,* to the UCC. *See* 4 *Collier on Bankruptcy* ¶ 552.02 at 552–11

(8th Ed.1989). The other interpretation relies primarily on the legislative history stating that "[t]he term 'proceeds' is not limited to the technical definition of that term in the UCC, but covers any property into which property subject to the security interest is converted." H.R. Rep. No. 95–595, 95th Cong., 1st Sess. 377 (1977), U.S.Code Cong. & Admin. News 1978, pp. 5787, 6333. This view encourages a broader coverage of proceeds than in the UCC. *See, e.g., 2 Norton Bankr.L. and Prac.* § 38.03 at 38–2 (1981) (proceeds includes "property into which the prepetition property is converted, property derived from the prepetition property, and income from the prepetition property that is acquired by the estate after the commencement of the case."). However, we believe that Section 552(b)'s express reference to "nonbankruptcy law" should take priority over a vague and isolated piece of legislative history. We also note that the judicial creation of a definition for "proceeds," broader post-petition than pre-petition, would produce arbitrary and poten-

*Comm. v. Marepcon Fin. Corp. (In re Bumper Sales, Inc.),* 907 F.2d 1430 (4th Cir.1990).

The parties do not dispute that the Bank Group's security interest extends to virtually all of Debtors' real and personal property—characterized by the Bank Group as a "blanket lien." Instead, the instant dispute is fueled by one primary issue: whether the restaurant revenues are § 552 proceeds of property subject to the Bank Group's pre-petition lien.

Under the Bankruptcy Code, the secured lender has the burden of proof on the issue of validity, priority and/or extent of its lien on the property. 11 U.S.C. § 363(*o*). In turn, the debtor-in-possession has the burden of proof on the issue of adequate protection. *Id.* The

> acquisition by the estate of additional collateral post-petition does not increase the value of the claim subject to adequate protection. If the value of the original collateral has not diminished, proceeds under § 552(b) may be used—pursuant to court order—to pay ordinary business expenses and administrative expenses, consistent with adequate protection.

*In re Markos Gurnee P'ship,* 252 B.R. 712, 717 (Bankr.N.D.Ill.1997), *aff'd,* No. 97 C 3571, 1998 WL 295507 (N.D.Ill. May 21, 1998).

### State Law

Massachusetts law governs the Credit Agreement and thus serves as a starting point in the analysis. The Massachusetts Uniform Commercial Code defines proceeds, in relevant part, as "(A) whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral; (B) whatever is collected on, or distributed on account of, collateral; (C) rights arising out of collateral." Mass. Gen. Laws ch. 106 § 9–102(a)(64) (2003).

On its face, the Massachusetts definition of proceeds does not include revenues generated by a service-oriented business since services are not tangible collateral. Further, there is no Massachusetts case law directly on point. Nevertheless, an argument can be made that the restaurant revenues are proceeds under Massachusetts commercial law since they are acquired, *inter alia,* upon the sale of food and beverage inventory and arise out of the use of fixtures and equipment, *i.e.* stoves, ovens, warmers, tables, chairs, plates, forks and knives, all of which are subject to Bank Group's pre-petition lien. These are examples, and not an exhaustive list, of ways in which the restaurant revenues conceivably could be proceeds of Bank Group's pre-petition security interest.

Other courts have considered whether revenues of alleged service-based industries, *i.e.* hotels and restaurants, are cash collateral. These cases are instructive on whether such revenues are proceeds.

### Hotel Revenues as Cash Collateral

In support of its position, the Bank Group relies primarily on a number of real estate cases involving revenues generated by hotels. *See, e.g., In re Nendels-Medford Joint Venture,* 127 B.R. 658 (Bankr. D.Or.1991); *In re Miami Center Assoc.,*

---

tially inequitable results. As a result, we hold that the UCC's definition and treatment of proceeds applies to Section 552 of the Bankruptcy Code.

*Unsecured Creditors Comm. v. Marepcon Fin. Corp. (In re Bumper Sales, Inc.),* 907 F.2d 1430 (4th Cir.1990).

This Court finds that following the *Bumper Sales* analysis does not run afoul of the Fifth Circuit's treatment of "rent" in *T–H New Orleans* because the Fifth Circuit looked to whether the legislative history would *exclude,* rather than whether the legislative history would broadly include, hotel revenues as rent.

*Ltd.*, 144 B.R. 937 (Bankr.S.D.Fla.1992). The issue in these cases typically is whether hotel revenues are "rents" and therefore, the secured lender's cash collateral.

For example, in *In re Miami Center Assoc., Ltd.*, 144 B.R. 937 (Bankr.S.D.Fla. 1992), the court held that § 552(b) applies to extend the lender's pre-petition liens to post-petition revenue based, in part, on "the unique nature of hotel financing, [and] the fact that the bulk of hotel revenue is generated from the use of rooms (*as opposed to services* )." *Id.* at 941 (emphasis added).

Bank Group's position finds some support in *In re Schaumburg Hotel Owner Limited Partnership*, No. 87 B 14301, 1989 WL 359490 (Bankr.E.D.Ill.1989), which held that a secured lender's broad lien created a lien on all of the debtor hotel's revenues, including income from the restaurant and bar, and such revenues were the lender's cash collateral. *See also In re Nendels–Medford Joint Venture*, 127 B.R. 658 (Bankr.D.Or.1991) (although "revenue generated from debtor hotel's holding for sale and sale of food and beverages is proceeds of inventory" the court found that the security agreement did not create a valid lien on inventory thus the food and beverage revenues were not the secured lender's cash collateral).

However, the hotel cases are distinguishable from the restaurant revenue situation in which revenues are derived primarily from services. In fact, one case cited by the Bank Group, *In re S.F. Drake Hotel Assoc.*, 131 B.R. 156, 159 (Bankr. N.D.Cal.1991), *aff'd*, 147 B.R. 538 (N.D.Cal.1992), distinguishes hotel revenues from restaurant revenues and notes "[a] hotel operation is unlike a racetrack, restaurant, or retail store, where the primary objective of the customer is to receive a service." The court reasoned that

[c]ertainly hotels provide services, but so also do apartment and office buildings. Any services that a hotel provides are *incidental* to room occupancy. The hotel guest's primary objective is shelter. That shelter is provided by the land and improvements of the hotel. A hotelier cannot operate a hotel without the real property and improvements, no matter what the extent of the services provided. *Id.* The issue with regard to the restaurant industry does not appear to be such a clear cut case.

### Restaurant Revenues as Cash Collateral

In the restaurant context, some authority supports the Debtors' position. In *In re Inman*, 95 B.R. 479, 480–81 (Bankr. W.D.Ky.1988), the Bankruptcy Court for the Western District of Kentucky noted that

the restaurant industry, in general, is a service-oriented industry. In comparison with food wholesalers and retailers who sell food products in their natural or packaged state, restaurants expend a great deal of time and energy preparing individual food orders by transforming these natural or packaged foods into menu items. As in any business, the cost of preparing such foods for human consumption is without a doubt passed on to the consumer.

In *Inman*, the secured lender held a security interest in the debtor's inventory. *Id.* at 479. The *Inman* court found that revenues generated by a fast food restaurant did not constitute proceeds from the sale of inventory. *Id.* at 481. The court held that the secured lender did not have a valid, perfected security interest in the resulting cash deposits and concluded that the Debtor's post-petition cash was free of the pre-petition interests of the secured lender.

In a similar vein to the hotel cases, some courts have held that a lender's security interest in real property does not create a post-petition lien on restaurant revenues.[3] *See, e.g., Everett Home Town Ltd. P'ship,* 146 B.R. 453, 456 (Bankr.D.Ariz.1992) (holding that restaurant revenues are not the proceeds of real property but the result of services provided by the business); *In re Zeeway, Corp.,* 71 B.R. 210, 211 (9th Cir. BAP 1987) (stating that restaurant income is not proceeds of the real property, but the result of the services provided by the business); *accord, In re Corner Pockets of the Southwest, Inc.,* 85 B.R. 559, 563 (Bankr.D.Mont.1988); *Mid–City Hotel Assocs. v. Prudential Ins. Co. of America (In re Mid–City Hotel Assocs.),* 114 B.R. 634 (Bankr.D.Minn.1990).

The Bank Group was only able to provide one bankruptcy court opinion that touched on the application of § 552 to restaurant revenues. In that case, the court stated, *in dicta,* that "the initial proceeds of the debtors' restaurant operation were unquestionably 'proceeds' of the bank's pre-petition collateral (such as the food that constituted the restaurant's inventory)" without any discussion of the basis for that general statement. *In re Markos Gurnee P'ship,* 252 B.R. 712, 720 n. 4 (Bankr.N.D.Ill.1997).

### The Instant Case

■ William Snyder, acting CEO and Chief Restructuring Officer of the Debtors, testified credibly that the post-petition cash generated by the Debtors is primarily derived from services provided by the Debtors. The record reflects some of the many services that a restaurant customer purchases, including preparation of the food, some level of food service, the lack of cumbersome dishwashing. Mr. Snyder's testimony indicated that the value of the food component of a meal is less than one-third of the price charged for the final plate of food.

Debtors argue, and the undisputed testimony of Mr. Snyder points out, that the cash generated by the operation of the Debtors' restaurants is derived primarily from the time and energy expended by the Debtors' employees who provide services for which the Debtors' customers pay. Without the labor of their employees, these Debtors would not generate any cash with which to run the businesses.

However, the security interest of the Bank Group is broad and includes the Debtor's pre-petition inventory of food and beverages and other related assets and also extends to Debtors' fixtures and equipment. The only asset converted to cash, though, is the food and beverage inventory. The Debtor's fixtures, *i.e.* the tables, chairs, plates, etc., are not converted to cash. The fixtures remain after the customer has left. The same is true of the equipment, for example the ovens, refrigerators, etc. The revenues generated from the use of fixtures and equipment in the present case does not constitute proceeds under Massachusetts law.[4] Therefore, the cash allegedly generated by Debtors' use of the fixtures and/or equipment in its business does not equate to proceeds of the fixtures and/or equipment. Bank Group, at best, may be entitled to adequate protection from any diminution in value of the fixtures and equipment by virtue of their use; however, discussion of what constitutes adequate protection, in

---

3. This line of reasoning seems correct to this Court. The proceeds of a restaurant's services are more detached from real property than a hotel's proceeds.

4. Bank Group did not argue that the cash allegedly generated as a result of the use of the fixtures falls within another § 552(b)(1) exception, *i.e.,* product, offspring, profits.

this limited context, is beyond the scope of this memorandum opinion.

This Court agrees with the court in *Inman* that the restaurant industry is a service-oriented industry and that "the cost of preparing food for human consumption is passed on to the consumer." *Inman,* 95 B.R. at 481. If consumers were solely purchasing the food component, they would look to the local grocery store, for example, to make such a purchase. Clearly, restaurant customers are paying some premium to have the food prepared prior to consumption and served to them. Similarly, third-parties purchasing pre-prepared foods from Debtors' distribution center are paying a premium for the privilege of having food delivered that is already prepared rather than in its natural state.

The Court disagrees with the result reached by the *Inman* court, however, that *none* of the revenues generated by a restaurant are proceeds of inventory. In this case, the Bank Group has a security interest in the Debtors' food and beverage inventory. The inventory is being disposed of on a daily basis. Thus, under Massachusetts law, that portion of the revenues acquired as a result of the disposition of the food and beverage inventory constitutes proceeds of such inventory. Under § 363(a), only that portion of the revenues, then, constitutes the Bank Group's cash collateral.[5]

This holding balances the outcome of the hotel revenues cases and the restaurant cases. The hotel cases involve use of real property without real diminishment to the facility, except over a long period of time. Yet, the rents generated thereby are typically cash collateral since they are generated primarily from the use of the real property. The restaurant cases, particularly *Inman,* focus on the fact that the restaurant industry is service-based, yet do not account for the utilization of the secured lender's collateral. In a restaurant, the food and beverages that make up the final product of the restaurant undoubtedly are used up in the process. The reasoned approach, then, is to grant a limited interest in post-petition revenues to secured lenders.

■ The Bankruptcy Code provides a second, alternative basis to limit the Bank Group's post-petition security interest in Debtors' post-petition revenues and thereby allow the use of post-petition income. Even if the Debtor's revenues could be deemed to be proceeds of the Bank Group's collateral under Massachusetts law, § 552(b) "grants the court broad equitable powers in determining the extent of the security interest Creditor may be allowed to maintain postpetition." *In re Patio & Porch Sys., Inc.,* 194 B.R. 569, 575 (Bankr.D.Md.1996); *see also Wolters Vill., Ltd. v. Village Props., Ltd. (In re Village Props., Ltd.),* 723 F.2d 441, 443 (5th Cir. 1984), *cert. denied,* 466 U.S. 974, 104 S.Ct. 2350, 80 L.Ed.2d 823 (1984). "This 'equities of the case' provision is intended to prevent secured creditors from receiving windfalls and to allow bankruptcy courts broad discretion in balancing the interests of secured creditors against the general policy of the Bankruptcy Code, which favors giving debtors a 'fresh start.' " *Patio & Porch Sys.,* 194 B.R. at 575. The equity exception of § 552 is to "cover cases where an expenditure of the estate's funds increases the value of the collateral. . . . [A]s an example the situation where raw materials are converted into inventory at the

---

5. Bank Group has reserved its right to show the extent of its lien in anything other than the value of the inventory, *i.e.* the relative value of the food component to consumers, for a later date.

expense of the estate (which would thus deplete the fund available for the general unsecured creditors)." *Village Props.*, 723 F.2d at 444.

■■■ Although the Court's analysis of whether the Debtors' post-petition revenues constitute proceeds is, by itself, sufficient to limit Bank Group's post-petition security interest, the Court finds that the equities of this case warrant a finding that Bank Group's security interest does not flow to all cash generated by Debtors, since all the cash is not proceeds of Bank Group's secured interest in inventory, but instead represents, in large part, the proceeds of Debtors' post-petition toil and effort. Bank Group's pre-petition security interest continues in any cash realized by Debtor as a result of the sale of the inventory, but, based on this record, only to that extent. To grant Bank Group a blanket lien on all of Debtors' cash generated post-petition would represent a windfall to Bank Group, in the face of Debtors' utilization of estate resources, *i.e.* the services of their employees, to increase the value of Bank Group's collateral, and would unfairly deplete the funds available for general unsecured creditors.

### Authority to Use Cash Collateral and Adequate Protection

■■■ The cash collateral generated by Debtors' sale of Bank Group's secured inventory is readily measured—it equals the cost of the inventory used in each sale. The Debtors seek to use Bank Group's cash collateral to continue their day-to-day operation.

Pursuant to § 363, the Court authorizes Debtors use of Bank Group's cash collateral, *i.e.* the cash generated as a result of the sale of inventory; however, Bank Group is entitled, pursuant to § 363(e), to the following relief as adequate protection. First, Bank Group is hereby granted a replacement lien on the inventory purchased post-petition. If the inventory levels remain the same, the Bank Group's cash collateral is not being utilized by Debtor other than to replenish Bank Group's secured collateral, whether secured by the pre-petition lien or the replacement lien. If the inventory levels decrease, Bank Group is granted a replacement lien in any other assets of Debtor, at the highest available priority, as more clearly defined in the Order Authorizing Limited Use of Cash Collateral and Granting Adequate Protection to Existing Lienholders, signed March 28, 2003, as needed to restore and maintain the Bank Group's secured position in inventory as of the Petition Date. With this in mind and upon this condition, Debtor is authorized to utilize cash collateral.

### Conclusion

Restaurant revenues are primarily the fruit of Debtors' labor; however, they do contain some component of proceeds of inventory. Thus, the cash generated from the sale of the inventory is Bank Group's cash collateral. In the alternative, pursuant to § 552(b), the equities of the case warrant limiting the Bank Group's interest in Debtors' post-petition cash to the value of the Debtors' inventory subject to Bank Group's lien that is converted to cash upon its sale.

Debtor is authorized to utilize Bank Group's cash collateral. As adequate protection, Bank Group is granted replacement liens on inventory acquired post-petition and, on a going forward basis, in any other assets of Debtor, as needed to restore and maintain the Bank Group's secured position in inventory as of the Petition Date.