IN the MATTER OF: STRICK CHEX COLUMBUS TWO, LLC, Debtor.

Bank of North Georgia, A Division of Synovus Bank, Movant,

v.

Strick Chex Columbus Two, LLC, Respondent.

CASE NUMBER 15–11276–WHD

United States Bankruptcy Court, N.D. Georgia, Newnan Division.

Signed November 19, 2015

J. Nevin Smith, Smith Conerly LLP, Carrollton, GA, for Debtor.

## *ORDER*

W. Homer Drake, U.S. Bankruptcy Court Judge

Before the Court is the Motion of Bank of North Georgia, a division of Synovus Bank (hereinafter, the "Bank"), for Adequate Protection or in the Alternative for Relief from the Automatic Stay (hereinafter, the "Motion") filed on July 24, 2015. The Court held a preliminary hearing on the Motion on September 2, 2015, and conducted an evidentiary hearing on October 27, 2015. The Court has jurisdiction over this matter as a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2), 1334.

## BACKGROUND AND PROCEDURAL FACTS

Strick Chex Columbus Two, LLC (hereinafter, the "Debtor"), filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on June 16, 2015. The Debtor owns and operates a "Checkers" fast-food restaurant in Columbus, Georgia, under a franchise agreement with Checkers Drive–In Restaurants, Inc. (hereinafter, "Checkers Corporate"). No trustee has been appointed, and the Debtor is acting as a "debtor in possession." *See* 11 U.S.C. §§ 1101(1), 1107.

On June 6, 2013, the Bank issued a loan to the Debtor in the amount of $329,941.51. In exchange for the loan, the Debtor executed a promissory note in favor of the Bank and granted the Bank a security interest in virtually all of the Debtor's personal property and the proceeds of that property.[1] The loan is also secured by a deed to secure debt on the Debtor's leasehold interest in the real property upon which the Debtor's restaurant is located and, by cross-collateralization, with the assets of Strick Chex Columbus Three, LLC (an affiliated business also operating a Checkers restaurant in Columbus) and Larry Strickland dba Strickland Ventures, LLC (a principal of the Debtor).

The Motion was filed shortly after the commencement of the case. In the Motion, the Bank argues that its collateral is subject to depreciation and that it is entitled to either relief from the automatic stay or adequate protection. The Bank particularly contends that because it has a blanket security interest in the Debtor's personal property, particularly inventory, equipment, and the Debtor's franchise agreement with Checkers Corporate, all of the Debtor's post-petition revenue constitutes the proceeds of the Bank's collateral. Thus, by paying its principals and employees and purchasing new inventory with that revenue, the Debtor is using the Bank's cash collateral without authorization. On its part, the Debtor argues that its revenue is not proceeds of the Bank's collateral and, therefore, does not constitute "cash collateral."

The Court held a hearing on the Motion on September 2, 2015, and granted the Bank interim relief in the form of adequate

---

1. The security agreement lists the property in the following categories: inventory; equipment; accounts, instruments, documents, chattel paper, letters of credit rights, and other payment rights; general intangibles; deposit accounts; investment property; software; and government payments and programs.

protection payments of $750 per month. The Court·ordered the parties to submit briefs "on the question of the Bank's interest in and the Debtor's use of cash collateral" and scheduled an evidentiary hearing for October 27, 2015. Interim Order, Doc. No.˙ 58. Having received the parties' briefs and evidence and having heard their arguments at the September 2nd and October 27th hearings, the Court concludes as stated below.

## DISCUSSION

To resolve the Motion, the Court must consider two questions: (A) whether and to. what extent the Debtor's post-petition revenues constitute the Bank's cash collateral; and (B) what relief is necessary to ensure that any interest the Bank has in the Debtor's property is adequately protected.

### A. *Cash Collateral*

██ "Cash collateral" is defined in § 363 as "cash, negotiable instruments . . . deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property . . . subject to a security interest as provided in section 552(b) of this title." 11 U.S.C. § 363(a). Section 552 in turn governs the application of pre-petition security interests post-petition. Section 552(a) provides the general rule that "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a). Section 552(b) contains the sole exception to this rule:

> [I]f the debtor and an entity entered into a security agreement before the commencement of the case and if the

security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

11 U.S.C. § 552(b)(1). Therefore, in order for a pre-petition security interest to attach to a debtor's after-acquired cash, making it "cash collateral," the secured creditor must show that the security agreement attaches to the proceeds of the collateral covered by the agreement and that the proceeds claimed as cash collateral are in fact "proceeds . . . of pre-petition property subject to the lien." *In re Cafeteria Operators, L.P.,* 299 B.R. 400, 405 (Bankr.N.D.Tex.2003); *see also* 11 U.S.C. § 363(p)(2) ("[T]he entity asserting an interest in property has the burden of proof on the issue of validity, priority, or extent of such interest.").

██ Here, the parties do not dispute the first prong of this analysis—that the Bank has a valid security interest in the Debtor's property and that the Bank's interest extends to the proceeds of that property. Instead, the parties focus on the second prong: whether the Debtor's post-petition revenue is proceeds of the Debtor's pre-petition property.

The Eleventh Circuit Court of Appeals has held that determining whether a party has a security interest within the meaning of § 552 is a question of state law, but whether the property at issue in a given case is "proceeds," as that term is used in § 552, is a matter of statutory interpreta-

tion and federal law. *See Fin. Sec. Assurance, Inc. v. Tollman–Hundley Dalton, L.P.,* 74 F.3d 1120, 1123–24 (11th Cir.1996) (per curiam). Courts should "look to the plain meaning of the statute" and be mindful of the fact that "Congress intended [§ 552(b) ] to cover a wide range of derivative property." *See id.* at 1124 (referencing Black's Law Dictionary and concluding that "rents" included hotel revenues).

■■■ Black's Law Dictionary defines the term "proceeds" as "[t]he value of land, goods, or investments when converted into money; the amount of money received from a sale." *Proceeds,* BLACK'S LAW DICTIONARY (9th Ed.2009). It also provides a secondary definition: proceeds are "[s]omething received upon selling exchanging, collecting, or otherwise disposing of collateral." *Id.* The use of the words "converted" and "disposing" in these definitions indicates that proceeds, even in a broad sense, can only come about as the result of the replacement or substitution of the collateral, and the case law supports this conclusion. *See In re Corpus Christi Hotel Partners, Ltd.,* 133 B.R. 850, 856 (Bankr.S.D.Tex.1991) ("Congress intended to extend a pre-petition lien post-petition when collateral is converted into new property."); *see also 1st Source Bank v. Wilson Bank & Trust,* 735 F.3d 500, 504 (6th Cir.2013) (applying Tennessee's Uniform Commercial Code and determining that in order for property to constitute proceeds, it "must have been obtained as the result of some loss or dispossession of the party's interest in that collateral, not simply by its use"); *Am. President Lines, Ltd. v. Lykes Bros. S.S. Co. (In re Lykes Bros. S.S. Co.),* 216 B.R. 856, 864 (Bankr.M.D.Fla.1996) ("The concept of 'proceeds' is only implicated when 'one asset is disposed of and another is acquired as its substitute.'" (quoting *FDIC v. Hastie (In re Hastie),* 2 F.3d 1042, 1045 (10th Cir.1993))). Conse-

quently, revenues generated by a business are not the "proceeds" of the real property "upon which the business is located." *See Everett Home Town Ltd. P'ship,* 146 B.R. 453, 456 (D.Ariz.1992). Nor does using equipment to create a good make the revenue generated by the sale of that good "proceeds" of the equipment. *See Swope v. Commercial Sav. Bank (In re Gamma Center, Inc.),* 489 B.R. 688, 697 (Bankr. N.D.Ohio 2013); *In re Cafeteria Operators, L.P.,* 299 B.R. at 409.

■■■ In this case, the only property that the Debtor could be said to have disposed of is its inventory. The Debtor owns and operates a restaurant, selling its inventory of food and drinks in exchange for payment. However, the Court cannot conclude that *all* of the revenue brought in from food sales is proceeds of the food inventory. Unlike grocery stores or other food wholesalers, restaurants are service oriented. *In re Inman,* 95 B.R. 479, 480 (Bankr.W.D.Ky.1988). Rather than simply selling food, restaurants "expend a great deal of time and energy in preparing individual food orders by transforming these natural or packaged foods into menu items." *Id.* at 481. Because "[r]evenue generated post-petition solely as a result of a debtor's labor is not subject to a creditor's pre-petition interest," *Arkison v. Frontier Asset Mgmt., LLC (In re Skagit Pac. Corp.),* 316 B.R. 330, 336 (B.A.P. 9th Cir.2004), at least one court has concluded that none of the revenue generated in the course of operating a restaurant is proceeds to which a creditor's interest could attach, *In re Inman,* 95 B.R. at 481. While that extreme approach may have its merits, it ignores the fact that "the food and beverages that make up the final product of the restaurant undoubtedly are used up in the process." *In re Cafeteria Operators, L.P.,* 299 B.R. at 409. Therefore, a more reasoned approach is to con-

clude that (1) a portion of a restaurant's revenue is received in return for the services provided, (2) a portion of the revenue is received as payment for the food itself, and (3) it is only that portion received in exchange for the inventory that constitutes proceeds of that inventory. *See id.* As for determining the value of the portion of the revenue that is proceeds of inventory, and thus cash collateral, the Court agrees with the conclusion of the Bankruptcy Court in *In re Cafeteria Operators, L.P.*: "The cash collateral generated by [the debtor's] sale of [the creditor's] secured inventory . . . equals the cost of the inventory used in each sale." *Id.* at 410.

Applying that reasoning to the case at bar, that portion of the Debtor's revenue received in exchange for its food inventory constitutes proceeds of the Bank's collateral, and thus is "cash collateral" that requires protection.

### B. *Adequate Protection*

 Having concluded that a portion of the Debtor's revenues are cash collateral, it was incumbent upon the Debtor to move for Court authorization or obtain the Bank's consent before it used that cash collateral. A debtor in possession may only use cash collateral, even in the ordinary course of business, if it has the consent of the creditor or court authorization. 11 U.S.C. § 363(c)(2). If the court authorizes the use of cash collateral, that use must be conditioned as necessary to provide adequate protection of the creditor's interest in the collateral. 11 U.S.C. § 363(e); *Scottsdale Med. Pavilion v. Mut. Benefit Life Ins. Co. in Rehabilitation (In re Scottsdale Med. Pavilion)*, 159 B.R. 295, 302 (B.A.P. 9th Cir.1993). The burden is on the debtor in possession to show adequate protection. 11 U.S.C. § 363(p)(1); *In re Chatham Parkway Self Storage*, 2013 WL 1898058, at \*3 (Bankr.

S.D.Ga. April 25, 2013). Though the Debtor has not moved for authorization to use the cash collateral, the Court will still address the issue, as the Motion already requires the Court to ensure that all of the Bank's interests in the Debtor's property are adequately protected or grant the Bank relief from the automatic stay. *See* 11 U.S.C. § 362(d)(1).

The Bank has specifically prayed for certain conditions it believes will provide adequate protection: "(1) a blanket replacement lien on Debtor's business assets; (2) insurance; (3) compliance with a cash budget reasonably acceptable to the [Bank]; (4) reasonable adequate protection payments of at least $2,000 per month; and (5) weekly financial reporting." The Court has no trouble concluding that insurance, compliance with a budget, and weekly financial reporting are all warranted and appropriate in this case. However, the appropriateness of the other two conditions—a replacement lien and adequate protection payments—calls for further discussion.

### 1. *Replacement Lien*

 The Bank has requested "a blanket replacement lien on Debtor's business assets" to protect its interest in the cash collateral. Because the Bank's interest in the Debtor's post-petition property is exclusively an interest in the proceeds of pre-petition inventory, rather than an interest in all of the Debtor's revenue, this case does not warrant the grant of a blanket replacement lien on all of the Debtor's pre- and post-petition assets. Instead, the Court finds that granting a replacement lien on the Debtor's post-petition inventory will be sufficient to protect the Bank's interest. This decision conforms to the relief ordered in *In re Cafeteria Operators, L.P. See* 299 B.R. at 410. There, the court reasoned that so long as "inventory levels

remain the same, the [creditor's] cash collateral is not being utilized ... other than to replenish [the creditor's] secured collateral, whether secured by the pre-petition lien or the replacement lien." *Id.* This Court agrees with that reasoning, and therefore, will grant the Bank a replacement lien on the Debtor's post-petition inventory. With this lien in place, the Court finds that the Bank's interest in the cash collateral is adequately protected, and will authorize the Debtor's use of that cash collateral. Nevertheless, the Court is mindful of the fact that inventory levels may fluctuate, causing the Bank's interest in the revenue generated by the sale of the inventory to be no longer adequately protected. Consequently, nothing in this Order should be read as limiting the Bank's ability to file a renewed motion for adequate protection or relief from the automatic stay, should there be a need to do so.

2. *Adequate Protection Payments*

■ The Bank has also requested that the Court order the Debtor to make "reasonable adequate protection payments of at least $2,000 per month." The Court's interim order directed the Debtor to pay $750 per month to the Bank as adequate protection, and the Court finds no reason to increase that amount at this time. To begin with, the Bank's cash collateral is protected by the replacement lien on the Debtor's post-petition inventory. As for the adequacy of those payments for protecting the Bank's interest in the Debtor's equipment, real property interests, and other non-cash property from depreciation, the Court refers to the September 2nd hearing on the Motion. There, the Debtor offered to make adequate protection payments for depreciation of the non-cash assets of $500 per month. When the Court suggested $750 per month, the Debtor agreed. The Bank has not presented any

convincing evidence suggesting that this does not adequately protect the Bank from any depreciation on the equipment or other non-cash property, or that an increase is necessary to protect the cash collateral in addition to the replacement lien. Accordingly, the Court will leave the $750 per month payments in place. *See In re Combs,* 2006 WL 6589888, at *2 (Bankr. N.D.Ga. Aug. 3, 2006) (Drake, J.) (denying adequate protection payments where the creditor failed to show why they were needed); *Zink v. Vanmiddlesworth,* 300 B.R. 394, 402 (N.D.N.Y.2003) (concluding that § 363(e) places the initial burden of showing the need for adequate protection on the creditor before requiring the debtor to show the interest is adequately protected).

## CONCLUSION

For the reasons set forth above, it is hereby **ORDERED** that the Bank's Motion for Adequate Protection is **GRANTED,** subject to the terms outlined below:

1. The Debtor is authorized to use the property identified as cash collateral in accordance with the terms outlined in this Order;

2. The Debtor shall continue making adequate protection payments of $750 per month and maintain adequate insurance in accordance with the Court's Interim Order issued September 15, 2015 (Doc. No. 58);

3. The Bank is granted (effective and perfected by operation of law and without the necessity of execution by the Debtor of any security agreements or financing statements) a replacement lien on all of the Debtor's pre- and post-petition inventory and the proceeds of that inventory;

4. The Debtor shall prepare a budget with input from the Bank and comply with that budget; and

5. The Debtor shall provide the Bank with weekly financial reports;

It is **FURTHER ORDERED** that nothing in this Order shall prevent the Bank from filing a renewed motion for adequate protection or for relief from the automatic stay.

The Clerk is **DIRECTED** to serve copies of this order on the United States Trustee, the Bank, the Debtor, respective counsel, the twenty largest unsecured creditors, and any creditors who have filed a request with the Court for notices.

**IT IS ORDERED.**