**In re FALCON OIL CO., Debtor.**

**NATIONAL GRANGE MUTUAL INSURANCE COMPANY, Movant,**

v.

**FALCON OIL CO., Respondent.**

**FEDERATED MUTUAL INSURANCE COMPANY, Movant,**

v.

**FALCON OIL CO., Respondent.**

**Bankruptcy No. 5–94–01616.**

United States Bankruptcy Court, M.D. Pennsylvania.

Dec. 16, 1996.

Leon Barson, Kevin Walsh, Adelman, La-vine, Gold & Levin, Philadelphia, PA, for Debtor/Respondent.

Robert Nowalis, Doran & Nowalis, Wilkes–Barre, PA, for National Grange/Movant.

John Dwyer, Cozen & O'Connor, Philadelphia, PA, for Federated Mutual/Movant.

David Smith, Duane Morris & Heckscher, Philadelphia, PA, for PNC Bank.

## OPINION AND ORDER

JOHN J. THOMAS, Bankruptcy Judge.

The Movants are Federated Mutual Insurance Company ("Federated") and National Grange Mutual Insurance Company ("NGM"). They are bonding companies asking for relief from the automatic stay to pursue the Debtor–In–Possession, Falcon Oil Co., ("Falcon") for sums that they were requested to pay the Commonwealth of Pennsylvania. Those sums approach $1.3 million dollars.

Many of the facts are not in dispute and have been stipulated to by document filed August 24, 1995. The pertinent parts of that Stipulation are as follows:

4. Beginning in July, 1984, and for each year thereafter until nonrenewal effective on May 31, 1995, NGM issued an annual liquid fuel tax bond to Falcon. Falcon paid the premiums of each of those bonds.

5. Beginning in June of 1989, and continuing each year thereafter until nonrenewal effective on May 31, 1995, Federated issued annual liquid fuel tax bonds to Falcon. Falcon paid the premiums for those bonds.

6. On December 13, 1994, Falcon filed a Petition for Relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101, *et seq.* Falcon remains in possession of its assets and is operating its business as a debtor-in-possession pursuant to 11 U.S.C. § 1107(a) and § 1108.

7. In June and July, 1994, Falcon received, used or distributed liquid fuels in the Commonwealth of Pennsylvania on which liquid fuel tax had not previously been paid.

8. To the extent that Falcon is a distributor of liquid fuels, it is subject to the applicable provisions of the Liquid Fuels Tax Act of the Commonwealth of Pennsylvania, 72 P.S. § 2611 (hereinafter "the Act").

9. During June and July, 1994, Falcon sold liquid fuels and did not pay liquid fuel

taxes to the Commonwealth of Pennsylvania, Department of Revenue (hereinafter "the Department").

10. All monies received by Falcon for payment for liquid fuels and/or other products sold by Falcon were deposited into bank accounts maintained by Falcon during the relevant time periods.

11. On or about July 28, 1994, Falcon calculated the amount of liquid fuel taxes owed to the Department as Five Hundred Ninety–Seven Thousand Two Hundred Fifty–Seven Dollars and Eighty–One Cents ($597.257.81).... Falcon did not pay that amount to the Commonwealth.

12. On or about August 27, 1994, Falcon calculated the amounts of liquid fuel taxes owed to the Department as Five Hundred Five Thousand Two Hundred Twenty–One Dollars and Ninety–Six Cents ($505,221.96).... Falcon did not pay that amount to the Commonwealth.

13. Taxes calculated for the month of June, ..., were payable by July 30, 1994.

14. The taxes calculated for the month of July, ..., were payable by August 30, 1994.

15. Falcon deposited the amounts received for payment for liquid fuels and/or other products sold by Falcon into the following accounts: First Valley Account No. 10004541; First Valley Account No. 2000367613; PNC Bank Account No. 90–5300–7936; PNC Bank Account No. 50–5300–3695; National Bank Account No. 198–8; First Eastern Account No. 30071104; PNC Bank Account No. 1104; PNC Bank Account No. 5316; PNC Bank Account No. 2232; CoreStates Bank Account No. 13233 (hereinafter "the Accounts").

16. On or about September 14, 1994, the Department filed a lien against Falcon for One Million Two Hundred Twenty–One Thousand Eighteen Dollars and Eighty–Two Cents ($1,221,018.82) which purported to represent unpaid taxes, penalties and interest on unpaid taxes.

17. On or about January 10, 1995, NGM received a letter from the Department demanding payment from NGM, as one of Falcon's bonding companies, for Falcon's tax liabilities in the amount of Five Hundred Forty–Four Thousand Seven Hundred Twelve Dollars and Thirty–Five Cents ($544,712.35).

18. On or about January 10, 1995, Federated received a letter from the Department demanding payment from Federated, as one of Falcon's bonding companies, for Falcon's tax liabilities in the amount of Seven Hundred Six Thousand Sixty–Two Dollars and Twenty–Nine Cents ($706,062.29).

19. On or about April 11, 1995, NGM paid Five Hundred Fifty–Two Thousand Eight Hundred Ninety–Five Dollars and Nineteen Cents ($552,895.19) to the Department representing NGM's entire share of the demand made by the Department.

20. On or about May 1, 1995, Federated paid Seven Hundred Twenty Thousand Nine Hundred Seventy–Three Dollars and Fourteen Cents ($720,973.14) to the Department representing Federated's share of the entire amount of the demand made by the Department.

The Falcon Oil Company was founded by Charles Passeri on or about 1982. Although he employed his brothers, Joseph, Rodney, and John, Charles was the sole owner and officer of the company through April of 1994. The business began with two service stations obtained from a third party and a truck that pulled a tank for fuel delivery. From that humble start, the business grew to a chain of ten service stations and a fleet of fourteen delivery trucks accounting for annual sales of approximately 60 to 80 million dollars.

From all appearances, things could not have been better. The company appeared to be doing well. Charles Passeri was a dynamic individual who not only buried himself deep into his work but enjoyed an extravagant lifestyle. Unfortunately, that situation was not to continue. In 1994, while doing a test run with a car that he had built, at the age of 35, Charles Passeri died of a heart attack.

While Charles had employed his brothers in the business, none of them had any involvement with its financial aspects. It therefore came as quite a shock to them

when they became aware, after Charles' death, that the company was in significant financial jeopardy.

Although the company had circulated financial statements of its ostensible health prior to Charles' passing, it was only after his death that an accurate financial picture was prepared by a Certified Public Accountant. That statement established the financial difficulties of the company. When those difficulties were expressed to PNC Bank, Falcon's main lender, it was only a matter of time before Falcon found itself filing for Chapter 11 relief on December 13, 1994, in order to reorganize its affairs and stay the bank's collection efforts.

Falcon's sales were generated from its deliveries to service stations, the sales of its product from its own service stations, and sales to homeowners for heating fuel together with some sales of non-fuel items. Most of these fuel sales were subject to the imposition of a tax under "The Liquid Fuels Tax Act". 72 P.S. § 2611a, et seq.

In order to indemnify the Commonwealth for a failure to pay the liquid fuels tax, Pennsylvania requires that a bond be posted. 72 P.S. § 2611c(c). Falcon posted that bond on an annual basis through the Movants, NGM and Federated. As a part of the renewal process, the bonding companies were free to request whatever financial information was necessary.

The renewal application for the bonds was made annually. The application for the time period subsequent to Charles' death included a specific caveat from Falcon to the effect that the existing financial information could not be relied upon but that the company was then undergoing an audit by a Certified Public Accountant. Despite this warning, both NGM and Federated chose to bond the Commonwealth for the liquid fuels' tax for the relevant months of June and July of 1994 without requiring additional data.

Falcon was unable to pay the liquid fuels' tax and the bonding companies were required to make the payment as indicated in the Stipulation. The Movants, now standing in the shoes of the Commonwealth of Pennsylvania, are demanding reimbursement from Falcon.

The bonding companies argue that Falcon had theretofore collected the liquid fuels' tax from its customers pursuant to the provisions of 72 P.S. § 2611d. They ask that the court make this finding inasmuch as the statute, according to them, requires that this tax be collected from the customer. Since the Debtor has collected this tax, according to the Movants, Falcon is now obligated to repay the bonding companies from the fund presumably collected under the equitable concept of constructive trust. Falcon, on the other hand, suggests that the collection of this tax from the consumer is not mandatory but permissive and, for that proposition, they rely on 72 P.S. § 2611e, which reads as follows: "Distributors *may* add the amount of the tax to the price of liquid fuels sold by them." [Emphasis ours.]

A fundamental presupposition of the Movants' trust argument is that the liquid fuels tax is a tax on consumers. This is a proposition specifically rejected by our Circuit in *In re Newland,* 115 F.2d 165 (3d Cir.1940). While acknowledging some contradictions in the Act, the Circuit's decision hinged on those sections of the law that imposed upon the distributor the responsibility to obtain the permit, furnish the bond, pay the tax, report the payment, keep and maintain the records, and allows them sole entitlement to refunds. *Id.* at 166.

Even if the Commonwealth mandated the collection of the tax by Falcon from the consumer, the testimony was unclear whether the appropriate tax was computed into the price. The case at bar seeks to place a constructive trust on the Debtor with regard to taxes that it was allegedly responsible to collect. As to whether Pennsylvania law would recognize a constructive trust under these circumstances, our readers' attention is drawn to *Philadelphia v. Mancini,* 431 Pa. 355, 246 A.2d 320 (1968) and *City of Philadelphia v. Penn Plastering Corp.,* 434 Pa. 122, 253 A.2d 247 (1969).

In *Penn Plastering,* the court reiterated the established principle of Pennsylvania law that "[o]ne who collects taxes as agent for a city and fails to pay the same over to the city

has long been held to be a trustee Ex malefi-cio," provided, however, the evidence establishes that the tax was actually collected. *Citing Philadelphia v. Mancini, supra.* If it was collected from the customer, then the argument could possibly follow that this fund never belonged to Falcon and, therefore, should be turned over to the Commonwealth of Pennsylvania or its subrogees, Federated and NGM, in accordance with traditional equitable principles recognized under state law, i.e., the constructive trust. On the other hand, if the tax was not established to have been collected, then there is no fund to turn over to the Commonwealth or its subrogee and the argument of the bonding companies would fail.

■ It is the burden of the proponent to establish the existence of a constructive trust. *In re Southmark,* 49 F.3d 1111, 1118 (5th Cir.1995), *In re Sacred Heart Hospital of Norristown,* 175 B.R. 543, 555 (Bankr. E.D.Pa.1994).

■ This is exactly where the bonding companies have dropped the proverbial "ball." Not a scintilla of evidence has been offered that the liquid fuels tax at issue has been collected. Indeed, the statute requires that a distributor collecting the tax must separate the tax from the price of the fuel on all "price display signs, sales or delivery slips, bills, and statements which advertise or indicate the price of liquid fuels." 72 P.S. § 2611e. No evidence of such "separation" has been offered. (*See, for example,* Transcript of 03/20/96 at 88.)

The evidence establishing the price structure for the products sold by Falcon Oil was vague at best. Prior to Charles' death, the retail price of fuel was set unilaterally by him in accordance with a formula that only he knew. While everyone assumed that there was a profit margin worked into that price of fuel, the price was obviously not sufficient to meet all operating expenses. Moreover, the details of the formula by which Falcon calculated its price per gallon apparently died with its chief executive officer, Charles Passeri. (Transcript of 03/20/96 at 86.)

Even if the Movants were able to overcome the large degree of uncertainty as to whether the liquid fuels tax was ever actually collected by Falcon Oil from its customers, the bonding companies are still faced with the difficulty of tracing this fund into a certain account or accounts in order to meet the second prong of the requirement that before a constructive trust could be found, the fund had to be traced. *City of Farrell v. Sharon Steel Corp.,* 41 F.3d 92, 95 (3d Cir.1994).

As a tool in assisting the proponent of a trust in tracing the res, our circuit has adopted the lowest intermediate balance rule or test. This rule allows a beneficiary to assume that trust funds are withdrawn last from a commingled account so as to conclude that the lowest balance in that account represents the undissipated trust fund. *In re Columbia Gas Systems Inc.,* 997 F.2d 1039, 1063 (3d Cir.1993), *cert. denied,* 510 U.S. 1110, 114 S.Ct. 1050, 127 L.Ed.2d 372 (1994).

To meet this burden of tracing, NGM and Federated apparently have relied on Paragraph 10 and 15 of the Stipulation of facts submitted by the parties indicating that all receipts of Falcon were deposited into some or all of ten various accounts maintained by Falcon and a related entity. The bonding companies submitted that tracing could be accomplished by using the lowest intermediate balance test in one of three fashions: first, by calculating the lowest aggregate balance in all of Falcon's accounts after the due date of the *respective* tax; second, by using the lowest aggregate balance in all of the accounts after the due date of the *latter* of the two tax periods in questions; or third, by adding the lowest balance in *each* individual account after the due date of the latter tax period until the bankruptcy filing date. (*See* Transcript of 11/06/95 at 11, et seq.)

While we understand and accept the lowest intermediate balance rule embraced by *Columbia Gas (In re Columbia Gas Systems, Inc.,* 997 F.2d 1039 (3d Cir.1993), *cert. denied,* 510 U.S. 1110, 114 S.Ct. 1050, 127 L.Ed.2d 372 (1994)),* the bonding company would have us include in these account balances the funds of CPI Trucking, Inc, a non-debtor (Transcript of 11/06/95 at 35) as well as funds collected on behalf of the Pennsylvania lottery. (Transcript of 11/06/95 at 37.)

The subject of tracing funds into multiple accounts was addressed by the First Circuit in *Connecticut General Life Insurance Company v. Universal Insurance Company*, 838 F.2d 612 (1st Cir.1988).

The normal rule for construing trust proceeds commingled in a bank account is known as the "lowest intermediate balance test." 4 Collier on Bankruptcy, supra, ¶ 541.13, at 541–77. Under that test, set down by the Supreme Court in *Schuyler v. Littlefield*, 232 U.S. 707, 34 S.Ct. 466, 58 L.Ed. 806 (1914), and *Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924), a court will follow the trust fund and decree restitution from an account where the amount on deposit has at all times since the commingling of the funds equaled or exceeded the amount of the trust fund. See 4 Collier on Bankruptcy, supra, ¶ 541.13, at 541–76. Where, however, after the commingling, all the money is withdrawn, the trust fund is treated as lost, even though later deposits are made into the account. Should the amount on deposit be reduced below the amount of the trust fund but not depleted, the claimant is entitled to the lowest intermediate balance in the account. This is based on the fiction that the trustee would withdraw non-trust funds first, retaining as much as possible of the trust fund in the account. See *Cunningham*, 265 U.S. at 12, 44 S.Ct. at 426. Here, there is no dispute that the lowest intermediate balance in the account into which the insurance proceeds were deposited is zero. CG attempts to overcome the obvious conclusion that it is thus entitled to take nothing by arguing, in essence, that the hotel corporation had not twelve separate bank accounts, but one general "cash-in-banks" account. CG bases this fictional combined bank account on the hotel's financial statements, which list "cash" as a single item. The fact that multiple accounts are consolidated for accounting purposes on a single line of the financial statement does not, of course, mean that they are effectively one account. Nor does it obviate the need for tracing the assets in any particular account. The point of tracing is to follow the particular entrusted assets, not simply to identify some assets. The Second Circuit faced a similar situation in *In re United Cigar Stores Co.*, 70 F.2d 313 (2d Cir.1934). There, the claimant was a joint venturer of the bankrupt and asserted a trust interest in several of the bankrupt's bank accounts. The court rejected the claim, both on grounds that a trust relationship was not proven, and because the trust funds were not traced. On the issue of tracing, the court noted that, while the aggregate balance of the bank accounts had been shown to be above the alleged trust amount at all times, the claimant had failed to trace the specific assets of any particular account, which might well have been depleted at some point. As in *United Cigar Stores*, CG has not directed this court to any particular asset of the hotel corporation where the alleged trust fund remains, even partially, intact. See also *Johnson v. Morris*, 175 F.2d 65, 67 (10th Cir.1949) (claimant "must trace his 'property in its original or converted form into specific or identifiable property in the possession of the receiver' "). *Connecticut General Life Insurance Company v. Universal Insurance Company*, supra at 818.

In short, the court noted that while, at all times, the total balance of all bank accounts had been shown to be above the alleged trust amount, the claimant had failed to trace the specific assets to any particular account which might well have been depleted at some point.

### CONCLUSION

The bonding companies assume that the liquid fuels tax is a tax on the consumer rather than the distributor. This is not the position of our Circuit. *In re Newland*, 115 F.2d 165 (3d Cir.1940).

Moreover, the bonding companies maintain that if it was the duty of Falcon to collect the tax, then this court should assume it was collected. We cannot make that leap in logic perhaps because we are just too calloused by the ways of the chapter 11 debtor who, prior to bankruptcy, has rarely paid the bills it should pay in deference to those bills that it must pay. Because a debtor is required to withhold a tax, pay a tax, or collect a tax, is

not the equivalent of finding that the tax was, in fact, withheld, paid, or collected. There is insufficient evidence on this record to establish that the tax was collected from the consumer. In fact, there is a plethora of evidence that Falcon collected less than it needed to pay its bills, due, no doubt, to the sparse accounting practices it maintained prior to bankruptcy.

Were we to conclude that the tax was collected from the customers, we are again faced with insufficient evidence that these collections can be traced to any specific account or accounts. The bonding companies have just not given us sufficient evidence to allow us to make that finding. We can find that funds were deposited into various accounts but we were given no information to determine to what extent the account balances represent receipts from the collection of taxes, sales, transfers from other accounts, lottery ticket sales or possibly capital investments of the owner. The record is completely devoid of any evidence of this nature.

Having failed to meet their burden in this endeavor, my conclusion must be that the Movant bonding companies cannot prevail in their request to obtain relief from the automatic stay.

Our Order is attached.

### ORDER

For the reasons set forth in the attached opinion, IT IS HEREBY

ORDERED that the Motions for Relief from the Automatic Stay filed by the above-captioned Movants are denied.