### In re SKAGIT PACIFIC CORPORATION, Debtor.

**Peter H. Arkison, Chapter 7 Trustee, Appellant/Cross Appellee,**

v.

**Frontier Asset Management, LLC, Appellee/Cross–Appellant,**

v.

**Sundt Construction, Inc., Appellee.**

**BAP Nos. WW–03–1637–MaSP, WW–04–1021–MaSP. Bankruptcy No. 02–25027.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted on June 25, 2004.

Filed Aug. 25, 2004.

Ordered Published Oct. 6, 2004.

---

Alan J. Wenokur, Seattle, WA, for Peter H. Arkison, Ch. 7 Trustee.

Craig S. Sternberg, Sternberg, Thomson, Okrent & Scher, Seattle, WA, for Frontier Asset Management, LLC.

Before MARLAR, SMITH and PERRIS, Bankruptcy Judges.

## OPINION

MARLAR, Bankruptcy Judge.

The chapter 7[1] trustee (the "Trustee") appeals the bankruptcy court's recognition of a security interest in proceeds from an

---

**1.** Unless otherwise indicated, "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, and rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9036.

account receivable. The Trustee contends that the receivable was generated from post-petition cash proceeds and had not been properly traced to pre-petition collateral. The secured creditor cross-appeals as to the amount of its traceable interest. The secured creditor also appeals the bankruptcy court's denial of a security interest in vehicles whose titles were never changed to reflect its liens. We REVERSE the recognition of a security interest in the post-petition account receivable as being improperly traced to pre-petition collateral, and AFFIRM the denial of a security interest in the titled vehicles.

## FACTS

Skagit Pacific Corporation ("Debtor" or "Skagit") manufactures and sells modular offices and trailers.

Skagit executed promissory notes, secured by certain property of the Debtor, in favor of Frontier Bank. The notes were personally guaranteed by Douglas Peterson, president of Skagit, and his wife, Jean ("the Petersons"). Skagit subsequently delivered, on the demand of Frontier Bank, the titles to 10 vehicles and trailers. Frontier Bank took possession of the titles but did not change the name on the certificate of title, nor did it have its lien placed thereon as required to perfect under Washington law.

In October 2002, Skagit defaulted on the note obligations to Frontier Bank and the bank sued the Debtor and the Petersons in state court. Skagit filed for chapter 11 bankruptcy protection on December 11, 2002.

In February or March 2003, the Petersons settled their portion of the Frontier Bank lawsuit. As part of the settlement, the Petersons took an assignment of Frontier Bank's secured position with respect to Skagit, including the notes and security agreements. Frontier Bank also delivered

the vehicle titles to the Petersons. The Petersons formed Frontier Asset Management LLC ("FAM") to hold and manage the interests purchased from Frontier Bank.

The parties agree that Frontier Bank held a valid and enforceable pre-petition security interest in owned or after-acquired equipment, inventory, accounts receivable, chattel paper, general intangibles, and all proceeds of such collateral; and, that the assignment to the Petersons was adequate. The parties also agree that FAM holds whatever interest Frontier Bank had in the titled vehicles.

Although FAM allowed the Debtor to use cash collateral after the commencement of the chapter 11 case, it did not (nor did the Debtor or Frontier Bank) seek an order allowing the use of cash collateral or providing adequate protection. FAM holds no replacement liens. No segregated account was designated for cash proceeds of collateral.

At some time late in the fall of 2002, pre-petition, the State of Alaska Department of Transportation sought bids for the construction and delivery of four modular trailers (the "DOT Contract"). The Debtor made a bid on the project post-petition, on January 21, 2003, and was awarded the DOT Contract on February 10, 2003. The Debtor began performance on the contract in April and completed its performance in July, 2003.

The case was converted to chapter 7 on July 21, 2003 and the Trustee was appointed. On August 12, 2003, the Trustee received a check for $207,000 on the completed DOT Contract from the State of Alaska ("DOT Account Receivable").

FAM moved for relief from the automatic stay on August 8, 2003 in order to foreclose on its collateral. The bankruptcy court granted partial relief. On October 9,

2003, FAM filed a Supplemental Motion for Relief From Stay, in which it asserted it held a lien in all of the Debtor's assets, including the 10 titled vehicles; and listing, as part of its collateral, the post-petition DOT Account Receivable, maintaining that it was property of the estate covered by its lien. The Trustee opposed the motion on the basis that FAM did not have a security interest in post-petition property unless FAM could prove that such property constituted traceable proceeds of pre-petition collateral.

In order to demonstrate the assets were proceeds of FAM's collateral, FAM provided a declaration by Mr. Peterson stating that the "funds generated by the sale of six modular units from inventory in June 2003 ($69,750) as well as the collection of pre-petition accounts receivable and on-going equipment sales went directly into the completion of [the DOT Contract]."

The bankruptcy court conducted a hearing on the lift stay motion. Mr. Peterson submitted a second declaration wherein he supplied, as evidence of FAM's proceeds, a "tracing" consisting of a two-page spreadsheet, listing amounts described as "Pre-petition FAM" and referencing deposits from various accounts, material returns, and inventory and equipment sales, totaling $88,939.86. The hearing was continued to provide the Trustee time to review the tracing. Mrs. Peterson then submitted a declaration stating she had revised the tracing of proceeds, going back to January 1, 2003 [2] (instead of April, 2003), increasing the figure to $146,556.73.

At the continued hearing, the Trustee argued that, at the very least, if the court were to accept FAM's tracing and base it upon the company's gross revenue, it should consider *all* the collected gross rev-

enue. The court agreed that the traced amount should be spread *pro-rata* between the collected accounts. It entered its Order on FAM's Motion for Relief from Stay on October 31, 2003, finding the traceable interest to be $71,415.00. (The court did not consider Mrs. Peterson's revised calculations).

FAM filed a Motion to Reconsider. At the hearing on that motion, the court backtracked and adopted the revised tracing calculation. However, the court reduced the net revenue of combined accounts receivable by $9,500 (money from sale of equipment pursuant to settlement with principals) and $10,000 (FAM's payment for attorneys' fees). The court entered an Order on FAM's Motion for Reconsideration on December 17, 2003, finding that $102,099.85 was traceable to FAM's prepetition assets. The court did not reconsider its ruling that FAM did not hold a security interest in the titled vehicles.

The Trustee timely appealed both the Order on FAM's Motion for Relief from Stay and the Order on FAM's Motion for Reconsideration. FAM cross-appealed beyond the deadline; however, the cross-appeal was allowed to proceed.

### ISSUES

1. Whether FAM had a security interest in the DOT Account Receivable, sufficiently traced as a proceed of its prepetition collateral.

2. Whether FAM had a perfected lien on certain titled vehicles and trailers.

### STANDARD OF REVIEW

We review legal issues *de novo* and the bankruptcy court's factual findings for

---

**2.** Mrs. Peterson's reasoning was that January 1 was the date closest to the day the Debtor started work on the DOT Contract. Accord-

ing to the pleadings in the record, the bid was made January 21, 2003, but performance on the contract did not begin until April 2003.

clear error. *Village Nurseries v. Gould (In re Baldwin Builders)*, 232 B.R. 406, 410 (9th Cir. BAP 1999).

 The bankruptcy court's decision to grant a motion for relief from the automatic stay is within its sound discretion and is reviewed for an abuse of discretion. *In re Delaney–Morin*, 304 B.R. 365, 368 (9th Cir. BAP 2003). A bankruptcy court necessarily abuses its discretion if it bases its decision on an erroneous view of law or clearly erroneous factual findings. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). The panel also finds an abuse of discretion if it has a definite and firm conviction that the bankruptcy court committed a clear error of judgment in the conclusion it reached. *Beatty v. Traub (In re Beatty)*, 162 B.R. 853, 855 (9th Cir. BAP 1994).

### DISCUSSION

The parties agree that, pre-petition, FAM held a valid perfected security interest in Skagit's inventory, equipment, accounts receivable, chattel paper and general intangibles, including those after-acquired, and the proceeds of such collateral. The parties disagree about whether FAM's security interest extends to the DOT Account Receivable performed and collected post-petition, and to the titled vehicles. Therefore, this matter requires a determination of the nature of the security interest held by FAM in the collateral and whether that interest is limited by bankruptcy and state law. *See In re Inv. Hotel Prop., Ltd.*, 109 B.R. 990 (Bankr. D.Colo.1990).

## I. THE DOT ACCOUNT RECEIVABLE

### A. Security interests in collateral under § 552.

Section 552(a) provides the general rule that property acquired after the commencement of bankruptcy is not subject to pre-petition liens.[3]

 Section 552(a) cuts off security interests on property acquired by the debtor after the petition date even if there is an "after-acquired" clause in the security agreement. The purpose of § 552(a) is "to allow a debtor to gather into the estate as much money as possible to satisfy the claims of all creditors." *In re Bering Trader, Inc.*, 944 F.2d 500, 502 (9th Cir. 1991).

There is an exception to the general rule of § 552(a). Section 552(b) provides that if a pre-petition security interest encumbers collateral and its proceeds, any proceeds of that pre-petition collateral remain subject to the security interest even if they are received post-petition.[4]

---

**3.** 11 U.S.C. § 552(a) reads: "Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case."

**4.** 11 U.S.C. § 552(b)(1) reads: "Except as provided in sections 363, 506(c), 522, 544, 545, 547 and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, or profits of such property, then such security interest extends to such proceeds, product, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing based on the equities of the case, orders otherwise."

■ Section 552(b) "balances the Code's interest in freeing the debtor of pre-petition obligations with a secured creditor's rights to maintain a bargained-for interest in certain items of collateral. It provides a *narrow* exception to the general rule of 552(a)." *In re Bering Trader, Inc.*, 944 F.2d at 502 (emphasis in original).

■ Proceeds of post-petition accounts receivable do not fall within the § 552(b) proceeds exception. *In re HRC Joint Venture*, 175 B.R. 948, 953 (Bankr. S.D.Ohio 1994); *In re Texas Tri–Collar, Inc.*, 29 B.R. 724, 726–27 (Bankr.W.D.La. 1983) (receivables generated by the debtor after filing bankruptcy petition are "in no way proceeds of prepetition accounts receivable"); *In re Cross Baking Co.*, 818 F.2d 1027, 1032 (1st Cir.1987) (post-petition receivables generally do not constitute proceeds of pre-petition receivables). Therefore, a creditor's security interest only encompasses the cash collected on existing pre-petition accounts.

■ It appears that pre-petition balances were outstanding on various Skagit accounts at the time of the bankruptcy filing, and were paid post-petition. There is no question that money collected on these accounts constituted proceeds of FAM's pre-petition security interest in accounts receivable. However, the money was then used, with the creditor's consent, to pay for such expenses as utilities, supplies, wages, and operations. In the process of doing so, new accounts receivable were created, including the DOT Account Receivable. These second and third-gen-

eration proceeds were then commingled in an account with non-proceeds.

■■ Furthermore, revenue generated by the operation of a debtor's business, post-petition, is not considered proceeds if such revenue represents compensation for goods and services rendered by the debtor in its everyday business performance. *In re Cafeteria Operators*, 299 B.R. 400, 405 (Bankr.N.D.Tex.2003). Revenue generated post-petition solely as a result of a debtor's labor is not subject to a creditor's pre-petition interest. *Id.* Thus, any portion of the DOT Account Receivable attributable to the Debtor's services as part of the manufacturing or production of the modules would not be considered proceeds under § 552(b). And what is produced by the debtor's added value by its labor (or the value added by others' labor) throughout the process of the reorganization effort will likewise not be subject to a creditor's pre-petition interest. *In re Package Design & Supply Co.*, 217 B.R. 422, 426 (Bankr.W.D.N.Y.1998) (consequences of added value may cause a commingling or other traceability problem that destroys the lien entirely).

■ Case law supports the proposition that where it is only post-petition acts which generate an account receivable, those post-petition receivables will not be considered proceeds because there is no interest in, or connection to, the right in the account receivable created pre-petition. Unless the court grants a replacement lien in new post-petition accounts receivable, the money used from the collected prepetition accounts no longer creates proceeds under § 552(b).[5]

5. Generally, a creditor must act quickly to prevent dissipation of its collateral. A debtor may not use cash equivalents of collateral or its cash proceeds without either the consent of secured parties with an interest in the cash, or the permission of the court. 11 U.S.C. § 363(c)(2). Where the creditor consents to

the use, it has the corresponding right to seek, from the court, both a lien on property and priority to the extent necessary to insure adequate protection. Here, the secured creditor did not act prudently to avail itself of Bankruptcy Code provisions to protect its secured position. 11 U.S.C. § 363(e). If the creditor

The DOT Account Receivable was collected in satisfaction of a new account that arose after the filing of the bankruptcy. As such, the DOT Account Receivable is not "proceeds" under § 552(b). State law allows secured parties to retain an interest in *identifiable* proceeds if properly traced to their pre-petition collateral. RCW § 62A.9A–315. Thus, the money collected from pre-petition accounts and used (to generate post-petition accounts receivable) can only be considered proceeds if there is competent evidence tracing it into the new receivable.

## II. TRACING PROCEEDS UNDER STATE LAW

### A. *Proceeds*

Whether particular property constitutes proceeds is determined by state law. *In re Days California Riverside Ltd. P'ship*, 27 F.3d 374, 376 (9th Cir.1994). "Proceeds" are defined under Washington law as:

(A) Whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral;

(B) Whatever is collected on, or distributed on account of, collateral

(C) Rights arising out of collateral;

(D) To the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects, or infringement of rights in, or damage to, the collateral; or

(E) To the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral.

RCW § 62A.9A–102(a)(64).

Washington courts have held that "proceeds" should be given a flexible and broad content which includes whatever is received for the sale or other disposition of collateral. *Rainier Nat'l Bank v. Bachmann*, 111 Wash.2d 298, 302, 757 P.2d 979 (1988). FAM relies exclusively on this expansive definition to assert it is entitled to *whatever* FAM received from the sale of its collateral.

However, RCW § 62A.9A–102(a)(64) only provides a definition of what might be considered proceeds; it is not the complete analysis.

### B. *Identifiable Proceeds*

A state's Uniform Commercial Code is a determinative factor of whether a security interest in proceeds survives the filing of bankruptcy. *In re Inv. Hotel Prop.*, 109 B.R. 990, 997 (Bankr.D.Colo. 1990). RCW § 62A.9A–315 (" § 315") limits a creditor's right to proceeds when a debtor files for bankruptcy. It provides that a security interest attaches and remains to any *identifiable* proceeds of collateral. RCW § 62A.9A–315(a)(2); (c),(d)(emphasis added).

The provisions of § 315 change the former UCC provisions of § 306. For example, § 306(4)(d)'s technical rules for reaching commingled cash proceeds is eliminated. Nevertheless, the creditor

---

fails to obtain such protection, its consent to the use of proceeds may destroy its right to trace those proceeds into other products. *Willamette Production Credit Assn. v. Lovelady*, 21 B.R. 182, 184–85 (Bankr.D.Or.1982). Moreover, the secured creditor's protected interest is limited to no more than it had on the date of filing. With the secured creditor's consent to the use of cash collateral, and no order for a replacement lien, the money used from the bank account is gone when it is used—i.e., it does not regenerate into new post-petition cash proceeds without a specific court order.

must show a transactional link between the proceeds and the collateral. *Gen. Elec. Capital Corp. v. Union Planters Bank,* 290 B.R. 676, 681 (E.D.Mo.2003).

██ Section 315(b) provides that when proceeds are commingled with other property, they are identifiable only (1) if the proceeds are "goods" as provided by RCW § 62A.9A–336; or (2) "to the extent that the secured party identifies the proceeds by a method of tracing, including application of equitable principles, that is permitted under law." Thus, once a debtor deposits cash proceeds into an account and commingles it with other money, the identifiability of a secured creditor's proceeds is destroyed unless the secured creditor can prove the money currently in the debtor's account corresponds to its collateral. *Id.*

██ The burden of tracing proceeds of collateral is on the party claiming the security interest in the proceeds. RCW § 62A.9A–315(b)(2); *Stoumbos v. Kilimnik,* 988 F.2d 949, 957 (9th Cir.1993).

Historically, courts have required a creditor to submit detailed documentary evidence or testimony proving that an account contained proceeds. Still, under the revised UCC, a creditor must provide documentation of its identifiable or traced proceeds. *Id.* at 958.

██ FAM provided, as evidence of its tracing, three spreadsheets contained in three declarations of the Petersons. The Trustee objected to the tracing methodology in pleadings and at hearings but has not supplied any counter-evidence to the amounts FAM has suggested is its prepetition traced proceeds. As a matter of law, the methodology used in the Petersons' tracing is insufficient under RCW § 62A.9A–315(b).

i. *Lowest Intermediate Balance Rule*

The Official Comments to § 315 state that the lowest intermediate balance rule ("LIBR") is an equitable principle that is permitted to be used to trace proceeds. RCW § 62A.9A–315, Comment 3. Tracing of commingled funds as a general accounting principle "is not foreign to the courts, and a doctrine known as the 'lowest intermediate balance' rule has evolved from equitable principles of trusts." *In re R & T Roofing Structures & Commercial Framing, Inc.,* 887 F.2d 981, 987 (9th Cir. 1989); *see also In re Falcon Oil,* 206 B.R. 715, 719 (Bankr.M.D.Pa.1996)(lowest intermediate balance rule is the normal rule for tracing proceeds commingled in a bank account); *In re Megafoods Stores, Inc.,* 163 F.3d 1063, 1068–69 (9th Cir.1998) (tracing commingled trust funds); Harris J. Diamond, *Note: Tracing Cash Proceeds in Insolvency Proceedings Under Revised Article 9,* 9 Am. Bankr.Inst. L.Rev., 385, 407 (2001) ("Though various methods of tracing exist, no form has been as widely used as the LIBR."); *Chrysler Credit Corp. v. Hall,* 312 B.R. 797, 806 (E.D.Va. 2004) ("To identify proceeds of collateral in a commingled account, courts rely upon tracing principles developed under the law of trusts and have employed the 'lowest intermediate balance rule.' ").

The LIBR assumes that traced proceeds are the last funds withdrawn from a contested account. If the traced proceeds are withdrawn and spent, they are treated as lost and no longer available. If the balance in the account falls below the amount of funds subject to the secured creditor's interest deposited into the account, the secured creditor is allowed only the lowest intermediate balance between the time of commingling and the time the rights in the account are determined. *Gen. Elec. Capital Corp.,* 290 B.R. at 682.

FAM's documentation does not follow the LIBR. In fact, it is unclear exactly

what methodology FAM has used to trace its proceeds.[6] FAM has offered various spreadsheets with figures in columns entitled "FAM" without explaining the basis or foundation of the documents or the direct link between the cash proceeds from sale of equipment and inventory to its use in the DOT Account Receivable.[7] In order to meet its initial burden of tracing, the self-serving testimony of a creditor is inadequate. *Stoumbos*, 988 F.2d at 958.

The Petersons controlled Skagit. Therefore, they should and could have instituted proper procedures to keep track of proceeds, segregate them as necessary, and have sufficient documents to show the transactional link between existing funds in the account and the proceeds of the collateral. *See id.* Even though the Trustee has not provided counter-evidence, the documentation submitted by FAM nonetheless fails to comply with the standard set under Washington state law by RCW § 62A.9A–315, and acknowledged by the Ninth Circuit.

It is FAM's position that if there is any cash available post-conversion, FAM is entitled to every dollar it "advanced" through the allowed use or sale of its secured assets.[8] FAM relies on *In re Bumper Sales*, 907 F.2d 1430 (4th Cir.1990), to suggest that it did not need detailed segregation and documentation of cash proceeds in order to claim its security. In *Bumper Sales*, the secured party held a valid floating lien against the debtor's inventory and accounts. The creditor in *Bumper Sales* did not seek adequate protection of its security interest or an order requiring a separate account for sequestering proceeds of collateral. During the course of the reorganization, the inventory and accounts turned over at least twice. The Fourth Circuit found that new inventory constituted identifiable second-generation proceeds of the pre-petition inventory. However, its finding was based entirely on the fact that the debtor had *stipulated* that all of the post-petition inventory was acquired using the proceeds of pre-petition inventory and accounts. Therefore, the secured party did not have to trace the post-petition inventory precisely back to the pre-petition inventory.[9]

**6.** The Comments to RCW § 62A.9A–315 state that whatever methods of tracing other law permits with respect to the type of property involved is permitted. For example, there is a tax tracing methodology and standard rules (used mostly in accounting) for inventory valuation called "first in, first out" and "last in, last out." *See,* Harris J. Diamond, *Note: Tracing Cash Proceeds in Insolvency Proceedings Under Revised Article 9*, 9 Am. Bankr. Inst. L.Rev., 385, 411–412 (2001).

**7.** At oral argument, FAM's counsel articulated that the method used was a "hybrid," without offering the Panel either authority or evidence which would adequately explain the process or method by which such a "hybrid" would operate.

**8.** Mrs. Peterson's October 30, 2003 declaration states: "In a manufacturing setting such as Skagit Pacific's, all overhead is directly and indirectly related to the production of new work. In our case, FAM, which has exactly the same security as Frontier Bank, allowed the use of funds to create new receivables. But it did not in any way give up its security interest in those assets, even if the funds are used to produce further work. So, to the extent that there is *any* cash available today (i.e. post-conversion), FAM is entitled to *every* dollar that it advanced through allowing the use or sale of its secured assets. These funds do not have to be traced directly to the production of any particular receivable-FAM's cash collateral was used to produce *all* the receivables, and in a manufacturing setting, all of the overhead is directly or indirectly used for the benefit of producing the work, which generates the receivable."

**9.** The author of a treatise on secured transaction notes that "most secured parties cannot count on such good fortune ... rather than rely on such uncommon good luck, the se-

Here, the bank account into which the Debtor deposited money from sales of equipment and inventory, and from the collection of accounts receivable, contained commingled funds. That is, the bank account also held proceeds of accounts receivables that were not encumbered by FAM's interests. Then, all such commingled monies from the account went to pay for the operating expenses of the business, payment of utilities, payroll, and also for attorneys' fees that were unrelated to the DOT Contract. Thus, the facts in this case are not as straight-forward as the *Bumper Sales* case where money from the sale of inventory was merely used to replace inventory. Nor did the Debtor have the "uncommon luck" to have a stipulation with either the Trustee or any other interested party.

Washington law allows a secured creditor to maintain its security interest only in identifiable proceeds of collateral if identified by a method of tracing permitted under law. Because FAM did not use the LIBR methodology, or any other recognized tracing method, as required under state law, the court abused its discretion in finding that FAM held a security interest

in the DOT Account Receivable as "proceeds" of FAM's pre-petition collateral.

## III. TITLED VEHICLES

FAM appeals the bankruptcy court's conclusion that FAM did not have a perfected security interest in 10 titled vehicles and trailers.

The nature, validity and perfection of security interests are determined by state law. *Butner v. U.S.*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Generally, Washington law requires a certificate of ownership, which lists the secured party, in order to perfect a security interest in a vehicle. RCW § 46.12.095.[10] However, an exception is made for manufacturers and dealers who hold vehicles or equipment in inventory.

Frontier Bank did not follow the perfection procedures under RCW § 46.12 by applying to the Washington Department of Licensing to have its name placed on the certificate of title. And, Frontier Bank is not a manufacturer or dealer holding equipment in inventory. Therefore, Frontier Bank (and subsequently FAM) did not have a perfected security interest in the vehicles.[11]

---

cured party in *Bumper Sales* should have filed a motion for adequate protection as soon as the debtor filed its bankruptcy petition." William H. Lawrence, et al., *Understanding Secured Transactions* 406 (Matthew Bender & Co., Inc., 2d ed.2000) (1999); *see also, In re Package Design & Supply Co., Inc.*, 217 B.R. 422, 426 (Bankr.W.D.N.Y.1998) (fact pattern of stipulation existing between the parties in *Bumper Sales* was "emphasized repeatedly").

Indeed, § 363(c) recognizes the "unique nature of cash collateral and the risk to the entity with an interest in such collateral, arising from the dissipation or consumption of the collateral in a rehabilitative effort in bankruptcy." *In re Rebel Rents, Inc.*, 307 B.R. 171, 183 (Bankr.C.D.Cal.2004).

**10.** "A security interest in a vehicle other than one held as inventory by a manufacturer or a

dealer and for which a certificate of ownership is required is perfected only by compliance with the requirements of RCW § 46.12.103 [requiring party to submit a transitional ownership record to the Department of Motor Vehicles listing the name and address of the security interest holder].... A security interest is perfected by the department's receipt of: (a) the existing certificate, if any, and an application for a certificate of ownership containing the name and address of the secured party, and tender of the required fee.... A security interest is perfected as of the time of its creation if the secured party's name and address appear on the outstanding certificate of ownership." RCW § 46.12.095(1), (2).

**11.** Frontier Bank did not assign any interest in the titles to FAM. Rather, it merely delivered the titles it had in its possession to FAM.

Nevertheless, FAM argues it has a security interest because (1) the vehicles were not used and were internally classified as "surplus" inventory; and (2) the titles were entrusted to FAM who held the titles in possession and therefore, ownership was transferred by operation of the UCC.

FAM asserts the equipment is unused and, as such, has become surplus inventory, held for sale. If the vehicles are inventory of a dealer, perfection may be accomplished by filing a financing statement; otherwise, the security interest may be perfected only by obtaining a certificate of ownership for the vehicle which lists the secured party. *In re Babaeian Transp. Co.*, 206 B.R. 536, 542 (Bankr.C.D.Cal. 1997); RCW § 62A.9A–311(d). (inapplicability of certificate of title requirements to those in the business of vehicles subject to the certificate of title statutes).

■ FAM has not cited any authority supporting its contention that lack of use of collateral changes its characterization. While the UCC allows the *use* of the collateral rather than its intrinsic nature to determine its classification for perfection purposes, it is the debtor's intended use at the time of purchase that controls if the actual use and the intended use are in conflict. *McGehee v. Exch. Bank & Trust, Co.*, 561 S.W.2d 926, 930 (Tex.Civ.App. 1978). In the Petersons' declarations, they repeatedly refer to the vehicles as equipment (not inventory),[12] suggesting the vehicles were actually intended to be equipment.[13] Neither Frontier Bank nor FAM

are in the business of selling equipment/vehicles of the kind at issue here. *See* UCC § 2–104(1), RCW § 62A.9A–311(d). Therefore, the exemption for holding vehicles in inventory does not apply to FAM.

FAM also relies on a theory of entrustment to provide a perfected security interest. The entrustment doctrine is set forth in Article 2 of the UCC, RCW § 62A.2–403, and provides that entrusting goods to merchants who deal in goods of the kind gives the merchant power to transfer all rights of the entruster. FAM argues that, under the entrustment principle, title to a vehicle may pass upon delivery and the failure to comply with the certificate statutes does not render the transaction void. *See Heinrich v. Titus–Will Sales, Inc.*, 73 Wash.App. 147, 161–62, 868 P.2d 169 (1994). This argument is without merit (and would otherwise only go to passage of title, not the perfection of liens on titled vehicles). The Debtor is not a merchant who deals in goods of the kind (equipment) who has been entrusted with the vehicles. Furthermore, the UCC does not govern perfection of certain assets that are subject to state certification of title laws. *See* RCW § 62A.9A–102(a)(10).[14] Therefore, any argument based on other sections of the UCC will not, contrary to the assertion made by FAM, trump state law licensing requirements for perfection as to titled vehicles.

A security interest in the vehicles was never properly perfected by Frontier

---

**12.** Inventory is defined as goods, other than farm products, which are leased by a person; held for sale or lease; are furnished under a contract of service; or consist of raw materials, work in process, or materials used or consumed in business. RCW § 62A.9A–102(48).

**13.** Equipment is defined as goods other than inventory. RCW § 62A.9A–102(33).

**14.** " 'Certificate of title' means a certificate of title with respect to which a statute provides for the security interest in question to be indicated on the certificate as a condition or result of the security interest's obtaining priority over the rights of a lien creditor with respect to the collateral." RCW § 62A.9A–102(a)(10).

Bank. Therefore, we AFFIRM the bankruptcy court's decision which denied FAM a security interest in the vehicles.

### CONCLUSION

The bankruptcy court erred when it determined that the secured creditor was entitled to funds from a post-petition account receivable as properly traced proceeds of its pre-petition collateral. Therefore, we REVERSE that portion of the order granting stay relief as to the DOT Account Receivable. We AFFIRM the stay relief order in all other respects, including the bankruptcy court's determination that the secured creditor did not have a properly perfected security interest in certain titled vehicles.

REVERSED IN PART AND AFFIRMED IN PART.